**UNITED STATES of America,**
**Appellee–Cross–Appellant,**

v.

**James PAYTON, aka James Perkins,**
**Defendant–Appellant–Cross–**
**Appellee.**

Nos. 96–1814, 97–1040.

United States Court of Appeals,
Second Circuit.

Argued Nov. 17, 1997.

Decided Oct. 5, 1998.

Brian T. Stapleton, Stamford, CT, for Defendant–Appellant–Cross–Appellee.

Karen L. Peck, Assistant United States Attorney, New Haven, CT (Christopher F. Droney, United States Attorney, District of Connecticut, New Haven, CT, of counsel), for Appellee–Cross–Appellant.

Before: KEARSE and CARDAMONE, Circuit Judges, and LEISURE *, District Judge.

* Hon. Peter K. Leisure, Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

CARDAMONE, Circuit Judge:

Defendant James Payton appeals from a judgment, which was entered on December 6, 1996 in the United States District Court for the District of Connecticut before Judge Alan H. Nevas, convicting him of being a felon in possession of a firearm shipped in interstate commerce. The government cross-appeals. Several of the issues raised during the trial and the sentencing proceedings challenge the district court's exercise of its discretion. For purposes of this appeal, the district court may be said to have exercised its discretion properly when in deciding a specific issue, it used—after considering relevant factors— sound judgment. It is only when we are firmly persuaded that the decision reached was not informed by such judgment that we characterize it as an abuse of discretion.

## FACTS

### 1. *The Search*

On December 29, 1994 at a local business in New Haven, Connecticut, two men robbed Donald Yazgoor at gunpoint and shot him in the abdomen. New Haven police subsequently arrested Gregory Lytell and Andrew Demand as suspects in the crime. Lytell and Demand told police that in exchange for a share of the proceeds, defendant James Payton loaned them the nine millimeter handgun used in the robbery. The suspects said they returned the handgun to Payton at 59 Admiral Street in New Haven and gave him $700 along with another gun they had stolen during the robbery. The victim, Donald Yazgoor, died on January 1, 1995 as a result of his gunshot wound. These events were the subject of widespread media reports in New Haven.

A day after the victim's death, the police, using the suspects' statements, obtained a warrant authorizing them to search Payton and the Admiral Street residence for firearms, ammunition, holsters, spent casings, masks capable of concealing identity, and U.S. currency. Executing the warrant the same day, police found defendant and several others on the second floor at 59 Admiral Street.

Prior to searching the premises, police conducted protective pat-downs of the occupants, and found 70 packets of heroin on Payton's wife, Shirley Little. She later signed a statement alleging that when the officers entered the house, defendant handed her the narcotics to hide. Little herself was arrested on narcotics charges.

Detective Thomas Trocchio, the lead investigator at the scene, testified at trial that he informed Payton the police had a search warrant, provided him with a copy of it, and told him the specific items for which they were looking. According to Trocchio—who insists he said nothing at this point about a nine millimeter handgun—defendant responded, "All I have is a .38, I know nothing—I didn't loan anybody any nine millimeter. All I have is my .38." Detective Trocchio further explained how defendant directed his young nephew to lead police to a back bedroom, which Payton identified as his own. From a bag on top of a dresser, police recovered a dismantled .38 caliber revolver and three live .38 caliber bullets.

In addition, Trocchio continued, he showed the .38 to defendant and informed him that as a convicted felon it was illegal for him to possess a firearm. Defendant repeated that all he owned was the .38 revolver and that he knew nothing about a nine millimeter handgun. Police never found a nine millimeter or any other gun during their search of the Payton home. Payton thereafter was arrested on state charges for criminal possession of a firearm by a convicted felon.

### 2. *The Trial*

On September 13, 1995 a Connecticut federal grand jury returned a one count indictment charging Payton with being a felon in possession of a firearm shipped in interstate commerce, in violation of 18 U.S.C. § 922(g) (1994). The state charges against Payton were dropped.

Defendant filed several pretrial motions in which he sought to suppress the statements he made to police during the search, access grand jury transcripts, and dismiss the indictment. All were eventually denied by the district court. The government then filed motions *in limine* seeking to use the prior

convictions of Doretha Payton—defendant's mother—to impeach her credibility in the event she testified as a witness for the defense. The district court granted this motion. The government also moved for permission to ask Detective Trocchio leading questions about the circumstances surrounding the search, that is, the investigation of the robbery and murder so as to give the jury some context for why the defendant made incriminating statements about owning a .38 caliber revolver. Since defense counsel responded that he intended to cross-examine Detective Trocchio about the robbery and Yazgoor's murder in order to explore the officer's state of mind, the district court permitted the government to ask leading questions during direct examination.

Payton was tried before a jury on August 6 and 7, 1996. The government first called the officers who conducted the search. It focused principally on Detective Trocchio's testimony concerning Payton's admissions at the beginning of the search and again after the revolver was found, the search itself and background information regarding the underlying investigation. Another arresting officer, Brian Sullivan, related his discovery of the .38 caliber revolver. The government asked a special agent with the Bureau of Alcohol, Tobacco and Firearms (ATF) to explain the gun's mechanics and how he successfully test fired the seized gun. Another ATF agent established the requisite interstate nexus for the crime by stating that the revolver's place of manufacture was Florida and the gun therefore had to travel in interstate commerce to reach Connecticut. As its last piece of evidence, the government produced a stipulation signed by defendant conceding that he had a prior felony conviction.

The defense called three witnesses in the following order—defendant's mother, defendant's sister, and defendant. Doretha Payton, who owns the house at 59 Admiral Street, declared the seized revolver belonged to a former boarder, Wylie Mickle. She said she found the gun after Mickle died and decided to keep it for herself in her bedroom, *i.e.*, the bedroom where police eventually discovered it. She testified she never gave the gun to defendant, and that her son, in fact,

did not even know of the gun's existence. She further stated that although he stayed at her home for short periods of time, and on one occasion spent several nights in the bedroom where the gun was found, Payton did not live at 59 Admiral Street. On cross-examination, the prosecutor sought to impeach Doretha Payton's credibility by introducing her 1983 convictions for making a false statement under oath to a government official and for third degree larceny.

Payton's sister, Karen Perkins, essentially corroborated her mother's story. Perkins noted she first discovered the gun when she and her mother cleaned Mickle's room following his death, after which her mother kept it. She also reiterated that defendant did not live on Admiral Street at the time of the search.

Testifying on his own behalf, Payton stated he lived at 73 Level Street with his wife and children, and that he was only visiting 59 Admiral Street on the night of the search. He explained that although he had never seen the .38 caliber revolver, he knew from family members that his mother kept a gun in her house for protection. He maintains that on the night of the search, police immediately questioned him about a nine millimeter handgun, but he had no idea why they were looking for such a weapon. Defendant said he told the police his mother owned a revolver so as to cooperate with the investigation because he "didn't have anything to hide." After police discovered the gun, defendant remembered saying it did not belong to him and categorically denied making any statement that would suggest otherwise. During cross-examination, the prosecutor, in response to Payton's statement that he had nothing to hide, questioned him regarding the 70 packets of heroin found on his wife.

In rebuttal, the government called several witnesses to refute the defense's assertion that the firearm at issue originally belonged to Wylie Mickle and was kept by Doretha Payton after his death. That proof showed that a woman named Sandra Kinsler purchased the revolver in Florida in 1991, and subsequently gave it to her husband, Bruce Kinsler, who transported it to South Carolina before moving to Connecticut in September

1992. Once in Connecticut, Bruce Kinsler testified, he sold it to a young black male on the street around Christmas time of 1992. According to a certified copy of a death certificate admitted into evidence, Wylie Mickle died on August 3, 1992, a month before Kinsler said he had moved to Connecticut, and several months before he stated he had sold the gun to the young man on the street.

At the end of the trial, the jury convicted Payton of possession of a gun by a convicted felon.

### 3. The Sentencing

For purposes of sentencing, the probation office submitted a Presentence Report (PSR) that calculated defendant's total offense level under the Sentencing Guidelines (Guidelines) to be 33—due, in part, to his status as an armed career criminal as defined in U.S.S.G § 4B1.4(b)(3)(B) (1995). Combined with a criminal history category of VI, the applicable sentencing range under the Guidelines was 235 to 293 months. The PSR also documented Payton's individual characteristics, including his personal and family data, history of substance abuse, mental and emotional health, and limited educational and vocational skills. It reported no mitigating or aggravating circumstances that would warrant a departure. Neither party filed an objection to the PSR prior to sentencing.

At the sentencing hearing the district court initially agreed with the PSR's conclusions. But when defendant, for the first time, requested a downward departure on several different grounds relating to his personal history and circumstances, the sentencing court said it was considering such departure. The prosecutor, urging that the government had been given no prior notice of any requested departure, asked for a continuance to address defendant's request. The proceedings were recessed briefly to allow the prosecution to review and respond to a memorandum prepared subsequent to the PSR by the probation department. Over the government's opposition, the sentencing court later granted defendant a downward departure of three levels, resulting in an offense level of 30 and a Guidelines

range of 168 to 210 months. Judge Nevas expressly based this departure on his assessment of defendant's personal characteristics and situation.

The December 6, 1996 judgment of conviction sentenced Payton to 180 months' imprisonment (15 years), the mandatory minimum sentence under 18 U.S.C. § 924(e). Defendant also was sentenced to five years' supervised release and a special assessment of $50. This appeal followed.

### DISCUSSION

On appeal, Payton contends the district court erred in several respects: when it denied his motion for acquittal due to insufficient evidence; admitted evidence of Doretha Payton's prior convictions; and permitted the government to cross-examine defendant about his wife's heroin possession. Defendant further alleges he was denied effective assistance of counsel during trial. The government cross-appeals from Payton's sentence. We affirm the judgment of conviction. On the cross-appeal, we vacate the sentence and remand. Each of the five issues will be discussed in order.

### I Sufficiency of the Evidence

At the conclusion of the government's case-in-chief, defendant moved pursuant to Fed.R.Crim.P. 29 for a judgment of acquittal on the ground that the evidence was insufficient to convict him under 18 U.S.C. § 922(g) for possession of a firearm by a convicted felon. He renews this argument on appeal. Section 922(g) provides, in relevant part:

> It shall be unlawful for any person ... who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year ... [to] possess in or affecting [interstate] commerce, any firearm or ammunition....

Payton avers that although he stipulated he was a convicted felon and concedes the revolver traveled in interstate commerce, the evidence adduced at trial was insufficient to allow a rational juror to find he "possessed" the revolver in question.

When a defendant challenges the sufficiency of the evidence underlying his

conviction, we review the evidence in the light most favorable to the government, drawing all possible inferences in favor of the prosecution. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *United States v. Gonzalez*, 110 F.3d 936, 940 (2d Cir.1997). Where there is conflicting testimony at trial, we defer to the jury's resolution of the witnesses' credibility. *See United States v. Stratton*, 779 F.2d 820, 828 (2d Cir.1985). The ultimate question is not whether *we believe* the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find. See Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *United States v. Hourihan,* 66 F.3d 458, 462 (2d Cir.1995), *cert. denied,* 516 U.S. 1135, 116 S.Ct. 962, 133 L.Ed.2d 884 (1996).

■ The government need not prove that Payton physically possessed the firearm to establish a § 922(g) violation; proof of constructive possession is sufficient. *See United States v. Rivera,* 844 F.2d 916, 925 (2d Cir.1988). Constructive possession exists when a person has the power and intention to exercise dominion and control over an object, and may be shown by direct or circumstantial evidence. *See id.* The government need not disprove that the weapon was subject to the dominion and control of others. *See id.* at 926.

■ The evidence before the jury, when viewed in the light most favorable to the government, was more than sufficient to prove beyond a reasonable doubt Payton's constructive possession of the .38 caliber revolver. Affirmative proof was presented of defendant's knowledge of the weapon and his intent to exercise control over it. That proof included Detective Trocchio's version of the search, according to which Payton was present at 59 Admiral Street when the search was conducted, volunteered he owned the revolver, directed police to his bedroom where it was found, and when it was shown to him, repeated that it belonged to him. Neither Payton nor anyone else present at the scene, according to the detective, denied the gun belonged to Payton. A rational jury could believe this account of the search. Moreover, because defendant testified at tri-

al, the jury was entitled to disbelieve his contrary testimony and use its disbelief to add weight to the government's case. *See United States v. Aulicino,* 44 F.3d 1102, 1114 (2d Cir.1995); *United States v. Stanley,* 928 F.2d 575, 577 (2d Cir.1991).

Payton's brief essentially recapitulates the evidence he adduced at trial to establish that the gun first belonged to Wylie Mickle and then passed into the hands of Payton's mother. This alternative explanation does not carry the day with respect to the challenge that defendant now mounts. The jury heard this version of events and was free to assign whatever weight it wished to the defense witnesses' credibility. *See United States v. Giraldo,* 80 F.3d 667, 673 (2d Cir.) ("The weight of the evidence is a matter for argument to the jury, not a ground for reversal on appeal."), *cert. denied,* —— U.S. ——, 117 S.Ct. 135, 136 L.Ed.2d 83 (1996). That the jury gave defendant's explanation little credence is understandable in light of the following: Bruce Kinsler's testimony that he sold the gun in question after Mickle's death, thereby refuting the defense theory that the gun ever belonged to Mickle; the government's impeachment of Doretha Payton with proof of her prior convictions for making a false statement under oath and for third degree larceny; and defendant's lengthy criminal record, which was before the jury.

## II Evidence of Doretha Payton's Prior Convictions

Doretha Payton pled guilty in 1983 to making an intentional false statement under oath to a public official and to third degree larceny. Both convictions arose out of her application for food stamps. The trial court permitted the government to introduce these convictions 13 years later for purposes of impeaching her credibility. Payton urges that this was error.

■ Fed.R.Evid. 609 governs the use of prior convictions as impeachment evidence. Specifically, Rule 609(a)(2) instructs that evidence of all prior convictions for crimes involving "dishonesty or false statement" shall be admitted, regardless of the degree of punishment. Rule 609(b), however, imposes a

time restriction of ten years on the admissibility of evidence under Rule 609(a)(2). A decision whether to admit evidence of older convictions for impeachment purposes will be overturned only for an abuse of discretion. *See Zinman v. Black & Decker (U.S.), Inc.,* 983 F.2d 431, 434 (2d Cir.1993).

### A. Crimes Involving Dishonesty and False Statement

■ Before addressing the time restriction, we must decide whether the crimes for which Doretha Payton was convicted involved "dishonesty or false statement." Although Congress narrowly defined this term because of the Rule's inflexible lack of discretion and potential for prejudice, *see United States v. Hayes,* 553 F.2d 824, 827 (2d Cir.1977), we nonetheless agree with the district court's conclusion that both crimes qualified as Rule 609(a)(2) crimes. Doretha Payton's conviction for making a sworn false statement to a government official is obviously a crime of dishonesty and false statement by virtue of its title alone.

■ With respect to her conviction for third degree larceny, we will look beyond the elements of the offense to determine whether the conviction rested upon facts establishing dishonesty or false statement. *See id.* Doretha Payton was convicted of larceny because she unlawfully received food stamps after falsely stating in a sworn application that she qualified for welfare. Because her conduct arises out of the making of a false statement, it falls within the categories of crimes contemplated by Rule 609(a)(2). *See Zinman,* 983 F.2d at 434 (affirming a district court's determination that making a false statement to a government agency in connection with a medicare application is akin to perjury and thereby bears heavily on the issue of credibility).

Defendant attempts to carve out a special rule for food stamp convictions, insisting that the Tenth Circuit's holding in *United States v. Mejia–Alarcon,* 995 F.2d 982 (10th Cir. 1993), stands for the broad proposition that prior convictions relating to the unlawful acquisition and possession of food stamps fail to qualify as crimes of dishonesty under Rule 609(a)(2). We cannot agree that *Mejia–*

*Alarcon* stands for any such expansive view regarding food stamp crimes. In holding that a district court erred by admitting a prior conviction for the unauthorized acquisition and possession of food stamps, the Tenth Circuit expressly noted the government's failure to "show that Mejia acquired the food-stamps in a deceitful manner." *Id.* at 990. Its holding rested on an examination of the specific facts of the crime, that is to say, the manner in which the crime was committed, and did not rest on a general legal pronouncement regarding food stamps. *Accord Hayes,* 553 F.2d at 827. Moreover, the facts of *Mejia–Alarcon* and the facts underlying Doretha Payton's convictions are distinguishable. Mejia acquired food stamps by trading four chrome pick-up truck wheels to an undercover agent. *See Mejia–Alarcon,* 995 F.2d at 988. In contrast, Doretha Payton made sworn false statements in her application for food stamps and thereby may be said to have acquired them in a "deceitful manner," an element lacking in Mejia's case.

### B. The Time Restriction

■ Having decided each conviction is a false statement crime, we now address the timeliness of their use. Rule 609(b) bars the use of a conviction more than ten years old to impeach a witness unless the court determines, in the interests of justice, that the probative value of the conviction substantially outweighs its prejudicial effect. *See* Fed. R.Evid. 609(b).

■ Doretha Payton's convictions were 13 years old. Hence, the trial court could admit them only after balancing their probative value against their prejudicial effect. A determination that the probative value of the conviction substantially outweighs its prejudicial effect must be made on-the-record and based on "specific facts and circumstances." *See* Fed.R.Evid. 609(b); *see also United States v. Mahler,* 579 F.2d 730, 734 (2d Cir. 1978) (requiring on-the-record findings). After hearing oral argument, the trial judge made several specific findings and put them on the record, including the following: Doretha Payton's credibility was "crucial" because she would be testifying in direct contradiction to the government's witnesses on the

key element of possession of the .38 caliber revolver; the impeachment value of her convictions was substantial; and the government provided defendant with sufficient advance notice of its intent to use these convictions in her cross-examination.

Contrary to Payton's assertions, the trial court properly exercised its discretion when making these findings. Even Payton acknowledges his mother's credibility was "critical" to an acquittal because, if the jury believed her testimony, it could not find he constructively possessed the gun. In addition, the record belies Payton's contention that his mother did not understand the application she falsified and thought she truly qualified for welfare, thereby rendering the convictions irrelevant to her credibility. The centrality of the credibility issue and the impeachment value of the prior convictions are highly relevant factors to a trial court's ultimate determination as to whether the probative value of an old conviction substantially outweighs its prejudicial effect in a current trial. See Zinman, 983 F.2d at 434 (relying heavily upon these factors); United States v. Gilbert, 668 F.2d 94, 97 (2d Cir. 1981) (same). We see no error in this regard.

III Shirley Little's Heroin Possession

On direct examination, Payton claimed he had nothing to hide from police during the night of the search. When asked why he informed police that a .38 caliber revolver might be in the house, he answered that the police told him they were looking for a nine millimeter and he was trying to cooperate: "I didn't have anything to hide so I was just being honest." But, in fact, as disclosed in the pretrial suppression hearing in this case, Payton did have something to hide: unlawful narcotics. In the ensuing search, the officers found 17 packets of heroin on the person of Shirley Little, Payton's wife. Little told the officers that Payton had given her the heroin to conceal as the officers entered the house. To impeach the nothing-to-hide testimony, the district court permitted the prosecution to cross-examine Payton about his knowledge of the heroin found on

his wife's person. Payton insists such cross-examination was error.

A. *Probative Value*

Fed.R.Evid. 403 recognizes that relevance alone does not ensure admissibility since relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. The government argues the probative value of the proof of heroin was strong because the evidence bore directly on defendant's credibility. Evidence has probative value if it tends to prove or to disprove a fact in issue. Fed.R.Evid. 401. Here, Payton placed his credibility in issue simply by taking the stand.

As the Supreme Court has observed: "It is essential ... to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States v. Havens*, 446 U.S. 620, 626–27, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). When a defendant offers an innocent explanation he "opens the door" to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination. *See, e.g., United States v. Beverly*, 5 F.3d 633, 640 (2d Cir. 1993) (defendant's testimony as to his unfamiliarity with guns opened the door to questioning about his prior possession and use of guns); *United States v. Garcia*, 936 F.2d 648, 654 (2d Cir.1991) ("once [defendant] Dominguez testified that he had no idea that the white powder was cocaine, he opened the door for the Government to impeach his testimony by establishing on cross-examination that he was familiar with and indeed had used cocaine as recently as the day before his arrest"). By testifying he had nothing to hide on the night of the search, Payton thereby entitled the government to introduce relevant evidence to impeach his credibility and to show that he was, in fact, hiding something.

A defendant has no right to avoid cross-examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him. In *Garcia*, for example, we allowed cross-exami-

nation because of Garcia's "[a]ttempt[ ]" on direct examination "to portray himself as a solid citizen with a stable family life." *Id.* The government need not offer extrinsic evidence to show that a defendant lied so long as it can point to a good-faith basis for its questions. *See generally United States v. Katsougrakis,* 715 F.2d 769, 778–79 (2d Cir. 1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984). Here, the government plainly had a sufficient good-faith basis for its cross-examination of defendant.

### B. *Prejudicial Impact*

■ Whatever the prejudicial impact of this evidence of heroin possession, it did not outweigh the probative value of Payton's testimony on cross-examination. Under our customary standard of review, because the trial judge is in a superior position to evaluate the likely impact of the proffered evidence, we will not overturn his ruling unless he has acted arbitrarily or irrationally or has otherwise abused his discretion. *See, e.g., Li v. Canarozzi,* 142 F.3d 83, 88 (2d Cir.1998); *United States v. Smith,* 727 F.2d 214, 220 (2d Cir.1984); *United States v. Robinson,* 560 F.2d 507, 514–15 (2d Cir.1977) (en banc), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *cf. United States v. Wiley,* 846 F.2d 150, 156 (2d Cir.1988) (district court may allow redirect examination "to rebut false impressions that arise from cross-examination, ... and the scope of such an examination is a matter confided to the district court's discretion"); *United States v. Finkelstein,* 526 F.2d 517, 527 (2d Cir.1975) (same), *cert. denied,* 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976). As we explained in *Robinson,*

> [b]road discretion must be accorded to the trial judge in such matters for the reason that he is in a superior position to evaluate the impact of the evidence, since he sees the witnesses, defendant, jurors, and counsel, and their mannerisms and reactions.... He is therefore able, on the basis of personal observation, to evaluate the impressions made by witnesses, whereas we must deal with the cold record.... [W]e cannot weigh on appeal, as he could

at trial, the intonation and demeanor of the witness[ ]....

560 F.2d at 514.

■ Moreover, even were we to think there was a strong prejudicial impact throwing into doubt the trial judge's Rule 403 holding, the error would be harmless in light of the ample evidence establishing Payton's guilt. We do not believe the very limited group of questions posed by the prosecution unfairly prejudiced defendant, viewed in light of the proof at trial as a whole. Further, defendant's own responses minimized the risk of prejudice. He informed the jury that the police never discovered drugs on him and never charged him with any narcotics offenses, and the government never introduced evidence to the contrary.

### IV Ineffective Assistance of Counsel Claim

■ In papers filed September 30, 1996 defendant moved for the appointment of substitute counsel, and his trial counsel, Michael Sheehan, Esq., moved to withdraw as counsel. Both requests cited Payton's lost confidence in Sheehan's representation after the guilty verdict was returned. The district court granted the motion and appointed Brian Stapleton, Esq., to represent Payton during sentencing and on appeal. Payton now asserts his trial counsel provided ineffective assistance. In particular, he attacks his trial counsel's decision to elicit information about the robbery and murder of Donald Yazgoor by urging this evidence inflamed the jury and was prejudicial to him.

■ In *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court adopted a strong presumption that trial counsel provides effective assistance. To overcome this presumption, defendant must establish: (1) his counsel's performance "fell below an objective standard of reasonableness" under "prevailing professional norms," *id.* at 688, 104 S.Ct. 2052; and (2) a reasonable probability that absent such unprofessional performance, the outcome of the proceeding would have been different. *See id.* at 694, 104 S.Ct. 2052. Defendant fails to make an adequate showing under either prong.

First, counsel's performance was reasonable. In a motion *in limine* the government notified the court and defense counsel that it intended to elicit limited information about the murder and robbery investigation to provide the jury with a context for Payton's incriminating remarks about possessing a .38 caliber revolver while disavowing knowledge of a nine millimeter. *See Gonzalez,* 110 F.3d at 942 (affirming the admission of background evidence that helped furnish an understanding for defendants' acts). Defense counsel did not object because, as he noted, he already intended to elicit from the police officers that they were looking for a gun used in a murder in which they believed Payton was involved. This decision was a matter of proper trial strategy stemming from defense counsel's earlier inability to suppress Payton's incriminating statements to the police regarding the .38 caliber firearm. Sheehan's strategy shifted to mitigate the harmful effects of those statements by calling into question the credibility of the officers who testified about them. A reasonable lawyer could think this background evidence would help support Payton's claim that he never made the statements. The evidence potentially provides police with a motive to implicate Payton by fabricating his statements about possessing the .38 caliber firearm, and thereby corner Payton into cooperating with authorities to solve the murder. Because counsel's strategy was reasonable under the circumstances of the case, this tactical decision does not fall below an objective level of competence. *See United States v. Vegas,* 27 F.3d 773, 777 (2d Cir.1994); *United States v. Eisen,* 974 F.2d 246, 265 (2d Cir.1992); *see also United States v. Kirsh,* 54 F.3d 1062, 1071 (2d Cir.1995) (strategic choices made after counsel's thorough evaluation of the facts and law are virtually unchallengeable).

Second, defendant fails to establish that absent counsel's tactical move, the outcome of the trial would have been different. As mentioned previously, the prosecution produced sufficient proof to allow the jury to find defendant guilty of the crime charged. We have no reason to believe that, absent the solicitation of limited background information regarding the robbery and murder, Payton would have been acquitted. Hence, Payton fails to overcome the strong presumption that his trial counsel provided effective assistance.

**V The Government's Appeal From the Downward Departure**

During sentencing Judge Nevas applied the armed career criminal provisions of 18 U.S.C. § 924(e) to Payton's case and accordingly determined Payton's offense level to be 33, his criminal history category to be VI, and the applicable Guidelines range to be 235 to 293 months. Following defendant's requests, the sentencing court indicated its intention to depart downward three levels based on a combination of factors. And, despite the government's opposition, the trial court departed downward to an offense level of 30 with a Guidelines range of 168 to 210 months. It ultimately sentenced Payton to 180 months' imprisonment.

### A. Sentencing Court's Discretion

A district court ordinarily must impose a sentence falling within the range of the applicable Guidelines. Each Guideline carves out a "heartland," a set of typical cases embodying the conduct described. *See* U.S.S.G. ch. I, pt. A, intro. comment. 4(b). Realizing some cases will fall outside the heartland of typical cases, Congress entrusted sentencing courts with discretion to take into account specific characteristics of the offender. Such courts are authorized to depart from the sentencing range set by the Guidelines when a case features aggravating or mitigating circumstances of a kind or degree not adequately taken into consideration by the Sentencing Commission when it formulated the Guidelines. *See* 18 U.S.C. § 3553(b). But, this discretion is not unfettered. The Guidelines prohibit consideration of several factors that otherwise could make a case atypical, for example, race, sex, national origin, creed, religion and socio-economic status, *see* U.S.S.G § 5H1.10, lack of guidance as a youth, *see id.* § 5H1.12, drug and alcohol dependence, *see id.* § 5H1.4, and economic hardship, *see id.* § 5K2.12.

Apart from these prohibited factors, the Commission did not limit the kinds of

factors that could constitute grounds for departure in a truly unusual case. *See id.* ch. I, pt. A, intro. comment. 4(b); *see also Burns v. United States,* 501 U.S. 129, 136–37, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991) ("[T]he Guidelines place essentially no limit on the number of potential factors that may warrant a departure . . . ."). Nevertheless, the Guidelines provide guidance in identifying permissible factors, by listing certain factors that are apt to make a case atypical, and then describing those factors as either encouraged or discouraged bases for departure. *See Koon v. United States,* 518 U.S. 81, 94, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

 A district court's decision to depart from the Guidelines is reviewed for abuse of discretion. *See United States v. Galante,* 111 F.3d 1029, 1034 (2d Cir.1997). In particular, the sentencing court's factual findings supporting the existence of a permissible factor on which to base a departure are reviewed under the clearly erroneous standard. *See* 18 U.S.C. § 3742(e); *United States v. Broderson,* 67 F.3d 452, 458 (2d Cir.1995). Appellate review also includes determining whether a district court's discretion was guided by an incorrect legal conclusion. *See Koon,* 518 U.S. at 100, 116 S.Ct. 2035. For example, a district court abuses its discretion when it relies upon an impermissible basis for departure. *See id.* Whether a factor is a permissible basis for departure is a question of law to which an appellate court need not defer. *See id.*

### B. *Factors Relied on for Departure*

In the case at bar, the sentencing court stated: "I'm going to find that *there are individual factors here that wouldn't warrant a downward departure individually* but combined, considered in total, would permit the court to depart downward." (emphasis added). It relied upon a combination of four factors for granting a three-level downward departure: (1) Payton's lack of a positive male role model as a youth; (2) his history of drug abuse and failed treatment; (3) his possible ineligibility for credit arising out of his pretrial detention; and (4) a learning disability that limited his educational opportunities. We address each factor in turn.

### 1. The First and Second Factors

 The Guidelines expressly prohibit a sentencing judge from considering a defendant's lack of guidance as a youth and similar circumstances, which would include lack of a male role model, *see* U.S.S.G. § 5H1.12, and a defendant's history of drug abuse, *see id.* § 5H1.4. Because a prohibited factor may never serve as a basis for departure, *see Koon,* 518 U.S. at 95–96, 116 S.Ct. 2035, defendant concedes the district court's error.

 The downward departure nonetheless may be upheld on the basis of the other factors cited. When a sentencing court relies on a combination of permissible and impermissible factors to justify a departure, the sentence will be affirmed if an appellate court determines the district court would have imposed the same sentence absent reliance on the impermissible factors. *See Williams v. United States,* 503 U.S. 193, 202–03, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992). We therefore must review the remaining factors to determine whether they alone support the departure.

### 2. The Third Factor

 We turn to the third factor—Payton's possible ineligibility for credit for his pretrial detention. Defendant remained in custody from his January 2, 1995 arrest until the return of his guilty verdict on August 8, 1996, for a total of 19 months—nine months in state and ten months in federal custody. Pursuant to statute Payton is guaranteed the right to receive credit for his ten months in federal detention preceding his August 8, 1996 federal conviction. The governing statute provides, in pertinent part, as follows:

> *Credit for prior custody.*—A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences . . . as a result of the offense for which the sentence was imposed . . . .

18 U.S.C. § 3585(b).

 Moreover, Payton may receive credit for his nine months in state custody. The United States Attorney General has the

authority to determine the appropriate credit for time spent in "official detention" under § 3585(b) once a defendant has begun to serve his or her sentence. *See United States v. Wilson,* 503 U.S. 329, 334, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992); *see also* 18 U.S.C. § 4001(b)(1) (vesting control and management of federal prisons in the Attorney General). Specifically, § 3585(b) permits the Attorney General to award credit for time spent in state detention pending trial on subsequently dismissed state charges that arose out of the same incident for which the prisoner was convicted in federal court. *See United States v. Moore,* 978 F.2d 1029, 1031 (8th Cir.1992) (reversing district court's rejection of Bureau of Prisons' award). The Attorney General delegated this authority to the Bureau of Prisons (BOP). *See* 28 C.F.R. § 0.96 (1997) ("The Director of the Bureau of Prisons is authorized to exercise or perform any of the authority, functions, or duties conferred or imposed upon the Attorney General by any law relating to the commitment, control, or treatment of persons ... charged with or convicted of offenses against the United States...."). Therefore, the BOP could conclude Payton should receive credit for time served in state custody because the initial state charges arose out of the same incident as his federal conviction.

The district court at sentencing wrongly assumed Payton would be ineligible for credit. Judge Nevas' concern on this score turns out to have been misplaced, as we have learned subsequent to the date of sentencing. We are advised by a letter from the U.S. Department of Justice dated November 18, 1997 that appellant will receive full credit towards his federal sentence for the 19 months spent in pretrial detention in state and federal custody. Further, under Bureau of Prisons regulation 28 C.F.R. § 523.17(*l*), pretrial detainees may be recommended for good time credit for the time spent in pretrial custody. The maximum good time credit a prisoner may receive is 54 days at the end of each year. *See* 18 U.S.C. § 3624(b)(1). The letter just referred to informs us that Payton has in fact been awarded 108 days good time credit, the maximum allowable, for his time in pretrial custody.

Hence, this factor does not support a downward departure.

### 3. The Fourth Factor

Having determined the other three factors are not valid grounds on which to base a departure, we need not address the fourth—Payton's learning disability and corresponding loss of educational opportunities. The district court already rejected this final factor, standing alone, as a basis for the departure. As a consequence, we must vacate the sentence imposed and remand for resentencing within the Guidelines range.

### CONCLUSION

Having considered all of Payton's challenges to his conviction, and finding no basis for reversal, the judgment of conviction accordingly is affirmed. With respect to the government's cross-appeal on the downward departure at sentencing, the sentence imposed is vacated and remanded to the district court for resentencing within the Guidelines range consistent with this opinion.