**UNITED STATES of America**

v.

**Vincent ALLEN, Defendant.**

**No. 01 CR 756–02(SAS).**

United States District Court,
S.D. New York.

Jan. 3, 2003.

Martin Stolar, New York, New York, for Defendant.

Bret Williams, Assistant United States Attorney, New York, New York, for the Government.

### *SENTENCING OPINION*

SCHEINDLIN, District Judge.

On April 18, 2002, defendant Vincent Allen pled guilty to the following counts:

Count 1—Conspiracy to transport and receive firearms in violation of 18 U.S.C. § 371.

Count 2—Dealing in firearms without a license in violation of 18 U.S.C. § 922.

Count 3—Conspiracy to distribute MDMA ("Ecstasy") in violation of 21 U.S.C. § 846.

Count 4—Distribution of Ecstasy in violation of 21 U.S.C. § 841.

Count 5—Distribution of crack cocaine in violation of 21 U.S.C. § 841.

Vincent Allen was sentenced on November 27, 2002. I write now to explain the reasons for that sentence.

### The Offense Conduct

The following fact recitation is drawn from the Presentence Report dated July 16, 2002. Vincent Allen was the subject of a "sting" operation initiated by the Bureau of Alcohol, Tobacco and Firearms ("ATF") with the assistance of a confidential informant ("CI"). On March 26, 2001, the CI met with Allen to discuss the purchase of a firearm. After making a telephone call, Allen informed that CI that a firearm was available at the apartment of Hector Arias, a co-defendant. Allen and the CI went to Arias's apartment at which point Arias had a Lorcin .25 caliber pistol, a gun pouch and six rounds of ammunition brought up to his apartment by Kevin Williams, another co-defendant. Arias then sold the firearm and ammunition to the CI in the presence of Allen and Williams. Arias gave the CI his phone number and told him additional firearms could be purchased the next day.[1]

Having successfully purchased a firearm through Allen, the ATF decided to expand the scope of its investigation. Accordingly, on April 2, 2001, the CI and Allen negotiated the sale of 25 grams of Ecstasy, to be delivered on April 5, 2001. On that day, the CI went to Allen's apartment where he purchased Ecstasy from Allen and a person named Tito. Later that month, Allen sold the CI 63 grams of crack cocaine in a taxicab parked outside of Allen's apartment building.

Allen was arrested on June 21, 2001. Following his arrest, Allen made a written statement informing the ATF that at the request of "Eric" (the CI), he acted as a middle man in a gun transaction between

---

**1.** Arias subsequently sold the CI the following additional firearms outside of Allen's presence: a Harrington and Richardson .410 cali-
ber sawed-off shotgun; a Ruger .22 caliber rifle; a Hi–Point 9 mm pistol; and a Lorcin 9 mm pistol.

Eric and Arias for which he was paid $50. Allen also stated that on one occasion, Eric asked him if he could get crack cocaine. Allen obtained the crack from another individual and then sold it to Eric. For this transaction, Allen received $60. With regard to the Ecstasy, Allen informed the ATF that he was paid $100 for arranging the sale between Eric and Tito.

**Offense Level Computation [2]**

Defendant pled guilty to five separate counts, charging him with dealing in drugs and firearms. In calculating the offense level, these counts are divided into two groups. Group I, consisting of Counts One and Two (the firearm counts) are grouped together pursuant to § 3D1.2(d) because the offense behavior was continuous in nature and the offense guideline is written to cover such behavior. Thus, the base offense level for these two offenses— one charging conspiracy to transport and receive firearms in interstate commerce and the other charging the sale of five firearms without a license—is found at § 2K2.1. Because the offense involved a firearm described in 26 U.S.C. § 5845 (the Harrington and Richardson .410 caliber shotgun) and one described in 18 U.S.C. § 921(a)(30) (the Ruger .22 caliber rifle), the base offense level is 18 pursuant to § 2K2.1(a)(5). This level is increased by two levels (to 20), pursuant to § 2K2.1(b)(1)(A), because the offense involved five firearms.

Counts 4, 5 and 6, are grouped pursuant to § 3D1.2(d) because the offense level is determined largely on the basis of drug quantity. The base offense level for Group II is found in § 2D1.1. Here, the offense involved 63 grams of crack cocaine and 25 grams of Ecstasy. Converting both to their marijuana equivalents results in 1,260

and 12.5 kilograms of marijuana for the crack cocaine and the Ecstasy, respectively. Because the drug offenses involved the equivalent of 1,272.5 kilograms of marijuana, the base offense level for Group II is 32 pursuant to § 2D1.1(c)(4). This level is decreased by 2 levels (to 30) pursuant to § 2D1.1(b)(6) because Allen has met the five criteria set forth in § 5C1.2 for "safety valve" treatment.

In sum, the base offense levels for Groups I and II are 20 and 30, respectively. The multiple count adjustment provisions do not require any additional units be added to the higher level because the gap between Group I and Group II is more than 9. *See* § 3D1.4(c) ("Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level."). Thus, the final offense level is 30 which is decreased by three levels (to 27) pursuant to § 3E1.1(a) and (b)(2), in recognition of Allen's acceptance of responsibility resulting primarily from his guilty plea.

**Criminal History Category**

Because Allen has no prior criminal convictions he has zero criminal history points, placing him in Criminal History Category I.

**Applicable Guidelines Range**

The sentencing guideline range for offense level 27, Criminal History Category I, is 70–87 months in custody.

**Downward Departure**

Defendant has moved for a downward departure on the ground that his mental and emotional condition takes his case outside the heartland of gun and drug distribution cases. *See* September 20, 2002 Letter from Martin Stolar ("Stolar Letter"). The Government initially assumed that de-

---

**2.** Unless otherwise noted, all references to " § __" are to the United States Sentencing

Guidelines effective November 2, 2002.

fendant was moving for a diminished capacity departure under § 5K2.13 and vigorously opposed a departure solely on that ground. *See* September 24, 2002 Letter from AUSA Bret Williams. I notified the parties that I would consider a possible departure under § 5K2.0 and solicited further briefing. Defense counsel decided to forego additional briefing, instead relying on his September 20 letter. The Government, however, submitted further argument opposing a downward departure pursuant to § 5K2.0. *See* November 11, 2002 Letter from AUSA Bret Williams. Having considered all three letters, and attached exhibits, I find that a combination of defendant's immaturity, his personality defects, and his subnormal intellectual functioning at the time of the offense warrants a § 5K2.0 departure. Before explaining the appropriate grounds for departure, I shall briefly discuss why the diminished capacity ground for departure does not apply to Allen.

The diminished capacity departure, found at § 5K2.13, provides as follows:

> A sentence below the applicable guideline range may be warranted if the defendant committed the offense while suffering from a significantly reduced mental capacity. However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; or (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public. If a departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity

contributed to the commission of the offense.

In accordance with *United States v. McBroom*, 124 F.3d 533 (3d Cir.1997), Application Note 1 now recognizes both a cognitive and a volitional prong to the diminished capacity departure by defining "significantly reduced mental capacity" to mean a "significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful." Allen does not satisfy either prong.

Defendant was evaluated by Alan M. Goldstein, Ph.D, a certified psychologist, on three separate occasions and a report on defendant's mental state was prepared. *See* Forensic Psychological Evaluation, Ex. A to Martin Stolar's September 20 Letter (the "Report"). In his Report, Dr. Goldstein states that "[Allen] readily admits that he was aware of the illegality of his actions as well as its wrongfulness." Report at 7. For this reason, defendant fails the cognitive prong. Moreover, there is nothing in Dr. Goldstein's report that would indicate a volitional impairment such that defendant could not help himself from committing the instant offenses. Nor can I imagine any impairment that would compel a person to act as a middleman in the exchange of contraband. Thus, defendant fails the volitional prong as well.

Additionally, § 5K2.13 may not apply at all because firearm offenses represent a serious threat of violence and, as such, may disqualify a defendant from a diminished capacity departure regardless of mental condition. For these reasons, defendant is not entitled to a diminished capacity departure under § 5K2.13.

Nonetheless, defendant's limited mental capacity, especially his immaturity, does take his case outside the heartland of drug

and gun distribution cases. The Sentencing Reform Act of 1984 requires a sentencing court to impose a sentence within the range prescribed by the Guidelines "unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b). Moreover, in *Koon v. United States*, 518 U.S. 81, 113, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996), the Supreme Court held that "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *See also United States v. Payton*, 159 F.3d 49, 60 (2d Cir.1998) ("Realizing some cases will fall outside the heartland of typical cases, Congress entrusted sentencing courts with discretion to take into account specific characteristics of the offender.").

"[Section] 5H1.1 prohibits departures based on age 'except in extraordinary circumstances.'" *United States v. Sally*, 116 F.3d 76, 78 (3d Cir.1997) (quoting *United States v. Shoupe*, 929 F.2d 116, 120 (3d Cir.1991)). The same holds true for departures based on physical condition. *See* § 5H1.4. Because age and physical condition are discouraged factors, a court "should depart only if the factor is present to an *exceptional degree* or in some other way makes the case different from the ordinary case where the factor is present."[3] *Koon*, 518 U.S. at 96, 116 S.Ct. 2035 (emphasis added). The following summary of Dr. Goldstein's Report pro-

vides ample basis to find defendant's limited mental capacity, combined with his immaturity, sufficiently extraordinary to warrant a departure.

At the age of fourteen, defendant was involved in an automobile accident causing him serious head injury. *See* Report at 3. Defendant suffered neurological impairment and, as a result, qualified for Social Security disability payments due to neurological dysfunction. *See id.* He was also placed in special education classes and was required to repeat the ninth grade. *See id.* At present, however, defendant's performance on various IQ tests does not suggest the presence of an underlying neurological disorder. *See id.* at 8.

While the effects of this accident on Allen's emotional and intellectual development cannot be known, defendant is certainly in the borderline range with respect to intellectual capacity. In 1998, defendant's full scale IQ was 94 while subtest scores ranged from mildly mentally retarded to average. *See id.* at 3. An educational evaluation conducted at that time revealed "very significant memory deficits." *Id.* In 2002, Dr. Goldstein administered an IQ test and obtained Verbal, Performance and Full Scale IQ scores of 86, 89 and 87, respectively. *See id.* at 8. Again, defendant's subtest scores ranged from mildly retarded to average. *See id.* Dr. Goldstein stated that defendant's "overall judgment or common sense falls between the borderline and the low average range." *Id.*

In addition to below average intelligence, defendant suffers from a number of personality defects, the most striking of which is his immaturity. In his Report,

---

**3.** At least one court in the Southern District of New York has recognized youth and immaturity as a valid basis for departure. *See United States v. Rodriguez*, 724 F.Supp. 1118, 1122 (S.D.N.Y.1989) (citing *United States v. Kopp*, 1 Fed. Sent. R. 123 (D.N.D.1988), as a case where a downward departure based on youth and immaturity was given).

Dr. Goldstein concluded that "[a]lthough twenty years of age, his ability to relate and to understand concepts resembled more that of a fourteen or fifteen-year-old than a mature adult." *Id.* Defendant's immaturity was also observed by his mother who stated: "Though he is twenty-one years old, Vincent seems to me to think and behave more like a fourteen year old." September 20, 2002 Letter from Teresa Allen, Ex. B to Stolar Letter. In addition to being immature, defendant has a low self-image and is severely depressed and anxious. *See* Report at 8–9. Finally, a personality quirk makes Allen overly willing to please others, even if it is to his own detriment. *See id.* at 11. According to Dr. Goldstein, Allen's need for acceptance is so overwhelming that he is likely to be manipulated by others. *See id.* Dr. Goldstein opined further that

> [a]lthough Mr. Allen readily admits that he was aware of the illegality of his criminal behavior and its wrongfulness, his cognitive limitations are such that his ability to carefully think through the consequences of his actions—weighing the pros and cons of his action—would be overridden by his need for acceptances, his desire to please, and his passive compliance with the wishes of others.
>
> [T]his evaluation strongly suggests that while aware of the wrongfulness of his act, Mr. Allen's intellectual and emotional predisposition was such that he could easily be conjured into participating in this criminal activity.

*Id.* at 11.

Given this confluence of personality defects, coupled with defendant's borderline intellectual functioning, it becomes apparent that defendant has real mental and emotional deficits. Although defendant is now twenty one, he is functioning at the level of a fourteen- or fifteen-year old. Indeed, if defendant were in fact a juvenile, rather than merely presenting in psychological terms as a juvenile, he would not be subject to the Guidelines at all. *See* § 1B1.12 ("The sentencing guidelines do not apply to a defendant sentenced under the Federal Juvenile Delinquency Act (18 U.S.C. §§ 5031–5042).""). Accordingly, I find that an eight-level departure, from offense level 27 to 19, is warranted in this case.[4] An eight-level departure takes into account this defendant's unique personality characteristics while still reflecting the seriousness of his offense. *See* 18 U.S.C. § 3553(a)(1) and (2).

The Second Circuit has instructed district courts to provide sufficient reasons to justify the magnitude of any given departure. *See United States v. Barresi,* 316 F.3d 69, at 72 (2d Cir.2002). There are a number of reasons why a downward departure from what would otherwise be a 70–87 month sentence is appropriate here. Defendant is twenty-one years old, single, and resides at home with his mother and her boyfriend. He dropped out of school in the ninth grade and has no real employment history. This is Allen's first criminal conviction and accordingly he has never been incarcerated. Allen suffered a brain injury at age fourteen and is considered somewhat slow. In addition, he has developed a drug habit. Defendant needs vocational training and psychological counseling. Accordingly, a limited period of incarceration will sufficiently serve the twin aims of punishment and deterrence. A lesser departure would require a period of incarceration that would defeat the goal of rehabilitation under these particular circumstances. At offense level 19, Crimi-

---

4. This departure is not based on defendant's age or youth at the time of the offense, but rather on defendant's mental age and his functioning as a juvenile.

nal History Category I, defendant's guideline range is 30 to 37 months in custody.

**The Sentence**

In light of the above, Allen is sentenced to 30 months in custody, to be followed by a three-year period of supervised release. In addition, Allen is required to pay a mandatory assessment of $500, payment of which is due immediately. No fine is imposed as defendant·is indigent and is unlikely to have any funds in the foreseeable future.

Defendant is to be supervised in the district of his residence and the standard conditions of probation as recommended by the Probation Department shall apply. In addition, the following mandatory conditions also apply: (1) defendant shall not commit another federal, state or local crime; (2) the defendant shall not illegally possess a controlled substance; and (3) the defendant shall not possess a firearm or other destructive device. The mandatory drug testing condition is suspended due to the imposition of a special condition requiring drug treatment and counseling.

The following special conditions are also imposed: (1) defendant shall participate in a substance abuse program approved by the United States Probation Office, which may include testing to determine whether defendant has reverted to the use of drugs and/or alcohol; and (2) defendant shall participate in a mental health program approved by the Probation Office. The defendant shall continue to take any prescribed medications unless otherwise instructed by a health care provider.