06-0638-cr
USA v. Elfgeeh

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2006

(Argued: April 26, 2007                    Decided: February 14, 2008

                                           Errata Filed: March 25, 2008)

Docket Nos. 06-0638-cr(L), 06-0744-cr(con)

_____

UNITED STATES OF AMERICA,

                              Appellee,

                              -v.-

AREF ELFGEEH and ABAD ELFGEEH,

                              Defendants-Appellants.

_____

Before: KEARSE and SACK, Circuit Judges, and MILLS, District
         Judge[*].

        Appeals from judgments of the United States District Court
for the Eastern District of New York, Sterling Johnson, Jr., Judge,
convicting defendants of operating and conspiring to operate an
unlicensed money-transmitting business, see 18 U.S.C. §§ 371,
1960(a), and convicting one defendant of structuring financial
transactions, see 31 U.S.C. § 5324(a)(3).

        Affirmed in part, and vacated and remanded in part.

        Judge Sack concurs in part and dissents in part in a

---

[*]    Honorable Richard Mills, of the United States District Court for the Central District of
       Illinois, sitting by designation.

separate opinion.

PAMELA K. CHEN and JEFFREY H. KNOX, Assistant United States Attorneys, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Barbara D. Underwood, Counsel to the United States Attorney, David C. James, Assistant United States Attorney, Brooklyn, New York, on the brief), for Appellee.

ARTHUR S. FRIEDMAN, New York, New York, for Defendant-Appellant Aref Elfgeeh.

JAMES M. BRANDEN, New York, New York, for Defendant-Appellant Abad Elfgeeh.

KEARSE, Circuit Judge:

Defendants Aref Elfgeeh ("Aref") and Abad Elfgeeh ("Abad") (collectively the "Elfgeehs" or "defendants") appeal from judgments entered in the United States District Court for the Eastern District of New York following a jury trial before Sterling Johnson, Jr., Judge, convicting them of operating an unlicensed money-transmitting business, in violation of 18 U.S.C. § 1960(a), and conspiring to do so, in violation of 18 U.S.C. § 371; and convicting Abad of structuring financial transactions, in violation of 31 U.S.C. § 5324(a)(3). Aref was sentenced principally to 51 months' imprisonment, to be followed by a three-year term of supervised release, and was ordered to pay a $500,000 fine and to forfeit $22,435,467. Abad was sentenced principally to 188 months' imprisonment, to be followed by a three-year term of supervised release, and was ordered to pay a $1,250,000 fine and to forfeit $22,435,467. On appeal, defendants contend principally that they

received an unfair trial due to newspaper publicity and trial testimony relating to terrorism and violence, and that the district court improperly instructed the jury on the mens rea element of the money-transmitting statute. Aref also contends that his postarrest statements were improperly admitted at trial. In addition, defendants challenge their sentences, contending, inter alia, that the prison terms imposed on them are unreasonable, both substantively and on various procedural grounds; and Abad contends that the amount of his fine is unreasonable. For the reasons that follow, we affirm the convictions and most aspects of the sentences, but we vacate and remand for reconsideration of the fine imposed on Abad and one of the sentencing enhancements applied to Aref.

## I.  BACKGROUND

The present prosecution arose out of the operation by Abad and his nephew Aref of a hawala, or money-transfer operation, at Abad's Carnival French Ice Cream (or "Carnival") shop in Brooklyn, New York. Abad was arrested in January 2003; an arrest warrant was issued for Aref, who was arrested in December of that year. In June 2004, the Elfgeehs were indicted on charges of operating an unlicensed money-transmitting business, in violation of 18 U.S.C. § 1960(a), and conspiring to do so, in violation of 18 U.S.C. § 371. As discussed in greater detail in Part II.D. below, § 1960 was amended in October 2001. Counts one and two of the indictment charged Abad with conspiring to violate, and violating, § 1960 prior to October 2001; counts three and four charged both Abad and Aref

- 3 -

with conspiring to violate, and violating, the post-October 2001 version of that section. A subsequent superseding indictment added a charge (count five) that Abad had engaged in structuring monetary transactions from January 1995 to January 2003, in violation of 31 U.S.C. § 5324(a)(3). Section 5324(a)(3) provides that "[n]o person shall, for the purpose of evading the reporting requirements of section 5313(a) or 5325 or any regulation prescribed under any such section, . . . structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions." The pertinent regulation under 31 U.S.C. § 5313(a) generally requires financial institutions, other than casinos, to file a report of any "deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction in currency of more than $10,000." 31 C.F.R. § 103.22(b)(1).

## A. The Trial

### 1. The Government's Evidence of Unlicensed Money Transfers and Structuring

At trial, Special Agent Brian Murphy of the Federal Bureau of Investigation ("FBI") explained for the jury what a hawala is:

> A Hawala operates in a similar fashion to a Western Union business. It's a money transfer operation. The word Hawala translated from Arabic into English means transfer. . . . [A] Hawala business is used to send money from one location to another.

(Trial Transcript ("Tr.") 223.) FBI Special Agent Daniel Gill described the benefits of using a hawala instead of using an official money-transmitting business such as Western Union:

> One, it's conducted outside the realm of licensed

- 4 -

banking activity.  There is no regulatory oversight.  Therefore, the transactions are basically conducted without any sort of legal review of how the transactions are conducted[.]

. . . .

A   (Continuing)   It   also   enables   the transactions to occur without any review by banking officials that they are conducted in accordance with procedures and laws which govern banking activity.

. . . .

Q  Are there any other advantages to the use of a hawala as opposed to licensed money transfer?

A   The true originator of the funds and the true beneficiary of the funds are not identifiable in the banking transactions.

(Id. at 516-17; see also id. at 501 (one of the advantages of such a system is that it "keeps the beneficiary and the originator of the transactions essentially anonymous in the transaction").)

The government's documentary evidence at trial, including several hundred exhibits, described and explained to the jury by Murphy, consisted in large part of account statements from a Carnival French Ice Cream account maintained by Abad at J.P. Morgan Chase Bank ("Chase"), as well as account statements from 12 "feeder" accounts at Chase and other banks.  These statements showed large totals of money deposited into the Carnival account in small amounts as transfers from 12 feeder accounts, and large sums of money wired out of the Carnival account to accounts in 25 other countries.  (See Tr. 234-36, 238-39, 242.)  For example, in a one-month period during the fall of 2000, more than $245,000 was deposited into the Carnival account and more than $268,000 was wired out.  (See id. at 234-36.) Between 1996 and 2003, the total amount deposited into the Carnival account was $22,190,642.21, and the total amount withdrawn was

$21,995,556.54.  (See id. at 239.)

Murphy described the overall flow of money in this case as follows:

> [M]oney was deposited into these feeder accounts, these 12 different feeder accounts.  After it was deposited, it was transferred to the JP Morgan Chase account and then after it reached the JP Morgan Chase account[ it] was then wired out to one of these 20-plus countries, ultimately making its way back to Yemen.

(Tr. 245.)  The money arrived in the feeder accounts by various means, including check deposits, cash deposits, and wire transfers.  (See id.)  Then,

> [m]oney got from the feeder accounts to the Carnival account in generally one of two ways.  Most often there were checks written . . . from one of the 12 feeder accounts, pay[able] to the order of Carnival French Ice Cream account and then it is deposited into the Carnival French Ice Cream account.  On some occasions the feeder accounts would wire money over to the Carnival French Ice Cream account.

(Id. at 247.)  Murphy testified that there were hundreds of checks from the feeder accounts made out to the Carnival account.  (See id. at 249.)

The government also offered as evidence the account-opening documents for the feeder accounts, including another Chase bank account in the name of the Prospect Deli that was opened by Aref and listed the home address and telephone number of Abad.  (See Tr. 258-60; see also id. at 268-69 (same account-opening information used for another feeder account at Astoria Federal Bank).)  The Prospect Deli was a business a few blocks away from the Carnival French Ice Cream shop; the Prospect Deli was in operation only from 1996 to 1998, but activity in the Prospect Deli bank account continued until 2002.  (See id. at 262-66.)  For example, bank

records showed that in 2001 approximately $850,000 was deposited into the Prospect Deli account and about $823,000 was transferred out to the Carnival account.  (See id. at 266.)

A representative of the New York State Banking Department testified that neither Abad nor Aref, nor any of their various entities including Carnival French Ice Cream, had a New York State license to transmit money.  (See Tr. 673-74.)  The government offered evidence that Abad was aware of the licensing requirement. It introduced a letter from the New York State Banking Department dated March 2002, found in Abad's files, stating that a New York State license was required before commencement of money-transmitting activities.  (See id. at 281-83.)  An application form for such a license was attached to the letter but was not filled out.  (See id. at 347.)  In addition, Murphy testified that he had been informed by Abad's attorney that Abad was "told he needed to get a license to remit money and that he had to apply for it and that he never did apply for that."  (Id. at 346.)

Murphy testified that after Aref was arrested in December 2003 and given Miranda warnings (Miranda v. Arizona, 384 U.S. 436 (1966)) (see Part II.A. below), Murphy asked Aref about his involvement in the money-transmitting business.

Q  What did he say?

A  He stated that he worked for other people in a money transfer or hawala business in the United States.

Q  Did he say what his responsibilities were?

A  Yes.

Q  What?

A  He had two responsibilities, the first was to open up several bank accounts to further the hawala business and the second responsibility was to make deposits of cash, generally between three and $4,000 into various bank accounts.

Q  Did he say he did that at another individual's request?

A  Yes.

Q  Did he say whether he received any compensation for his involvement in the hawala?

A  Yes.

Q  What?

A  He stated he got room and board and a salary or small salary for that, for his work.

(Tr. 314.)

With respect to the structuring count against Abad, Murphy testified that the bank records obtained by the FBI for the 12 feeder accounts showed 3,252 cash deposits; only one of them was a cash deposit for more than $10,000 triggering a reporting requirement for the bank. (See id. at 256.) However, on each of several hundred days, an aggregate of more than $10,000 was deposited into the feeder accounts. (See id. at 257.) Murphy explained the significance of the $10,000 threshold:

What happens is, when you enter a bank, if you have an amount of cash over 10,000, you are required to give information to the bank and generate--the bank generates what's called a CTR, or Currency Transaction Report. That then is filed with the Internal Revenue Service, and that information is tracked by the government.

(Tr. 256.)

A former customer of Abad's hawala, Abdul Hizam, testified that Abad helped him purchase a house in Yemen by sending the money to Yemen on his behalf. (See id. at 297-99.) Hizam testified that

- 8 -

Abad asked him to write several checks, each for less than $10,000, and to date the checks differently, though he gave Abad all of the checks at once. (See id. at 299-301.) The checks were variously made out to cash or the Carnival French Ice Cream store, and were deposited into several different feeder accounts. (See id. at 302-04.) Hizam testified that, in exchange for Abad's sending Hizam's money to Yemen, he paid Abad $2,900, which he understood was compensation for Abad and Abad's contact in Yemen. (See id. at 305.) Another customer, a cousin of Abad's, testified that Abad charged a commission for each money transmittal, $30 to $40 for every thousand dollars sent. (See id. at 416, 418.)

The government also presented the testimony of a handwriting expert who gave his opinion that Abad's handwriting was on several documents that related to the Carnival account and the 12 feeder accounts. (See Tr. 561-62.) The expert testified that although the name on some of the documents was that of Abad's cousin, Nasser Elfgeeh, the documents had been signed by Abad. (See id. at 563-64; see also id. at 574 (opining that on some checks, Abad signed Nasser Elfgeeh's name); id. at 575-76 (opining that on some checks and deposit tickets, Abad signed the name Saleh Aljahmi); id. at 576 (opining that on some checks, Abad signed the name Mahmood Elfgeeh).)

In addition, the expert testified that on several checks written on the Prospect Deli account payable to the Carnival French Ice Cream account and signed in the name of Aref, Aref's name was in the handwriting of Abad, indicating that Abad had signed those checks using his nephew's name. (See id. at 569-70; see also id. at

-9-

577 (same).)  Other checks appeared to have been filled out by Abad but actually signed by Aref.  (See id. at 571.)  The handwriting expert also identified writing on many of the deposit tickets for the Prospect Deli account as the handwriting of Aref.  (See id. at 567-69.)

## 2.  The Defense Case

Abad and Aref testified in their own defense.  As to the unlicensed-money-transfer counts, Abad's primary defense was that the hawala was a "service" to the Yemeni community in Brooklyn (Tr. 726) and was not intended to make a profit (see id. at 727), and hence Abad did not consider it a "business" within the meaning of § 1960(a).  Abad testified that the hawala service was for Yemeni-Americans only (see Tr. 727), that he transmitted money only for individuals, not for businesses (see id. at 729), and that he charged individuals for his service only in order to cover the banking fees charged by commercial banks for the transmissions and to cover the costs of delivering the money on the receiving end (see id. at 741; see also id. at 738 ("I wasn't in a business, it was a service.")).

Abad had adverted to this defense in his cross-examinations of Special Agents Murphy and Gill, eliciting that Murphy, in his investigations, had not come across any advertisements for the hawala (see, e.g., Tr. 332), and eliciting from Gill that the books of the hawala did not show a profit (see id. at 525-26).  The government had countered this defense with testimony by the New York State Banking Department representative,

who testified that a money-transmitting business need not take in revenue, and need not be profitable, to trigger the licensing requirement. (See id. at 675.)

Abad also testified that he was unaware of the licensing requirement when he began transmitting money for Yemeni community members in 1995, and only learned in 2002 that he might need a license. (See Tr. 728-29, 734-35.) Abad testified that at that time he determined that the licensing requirement did not apply to his money-transmitting business because the application appeared to apply to banks and because New York State "wanted $500,000 on deposit." (Id. at 737.)

With regard to the structuring count, Abad offered the following testimony:

> Q  You've heard testimony here there was, I think was described as 12 feeder accounts in various banks throughout the area.
>
> Would you please explain, did you make deposit[s] in various bank accounts?
>
> A  I did.
>
> Q  Why did you do that?
>
> A  These accounts, most of them or half of them had either my name individually or with the joint account with any other member of the family or partner and for the safety of this money that the people bring, I have to bring different accounts in order to have it safe. Additionally, to save some money because Chase bank charges a lot of money because it's a business account, these savings and checking accounts I put the money in, it's free. They don't charge you anything.

(Tr. 730.) Abad also stated that he did not instruct Abdul Hizam to divide his money into checks for less than $10,000. (See id. at 746.)

On cross-examination, the government elicited testimony from Abad that he was aware of numerous other licensing requirements for Carnival French Ice Cream, including requirements for a fire permit, an illuminated sign permit, and a health certificate to sell frozen food. (See id. at 755-57.) The government also questioned Abad about the fact that he incurred more fees by depositing money in small amounts into several different accounts than he would have had he deposited a larger amount into the Carnival account; Abad acknowledged this but nonetheless maintained that he divided the money among the feeder accounts to save money. (See id. at 764-68.) Abad stated that since all the accounts were his, "I put [the money] in any account I choose. It doesn't matter to me, make a difference to me." (Id. at 770.) Abad admitted on cross-examination that he signed various checks and deposit tickets in the names of five or six of his relatives. (See id. at 801-04.)

Abad also admitted that after his arrest, he failed to disclose to the magistrate judge that he had access to the Prospect Deli account, and he instructed Aref to withdraw $21,000 from that account and send it to Yemen. (See id. at 807-08.) Cross-examination of Aref revealed that the checks sent to Yemen were backdated to a date prior to Abad's arrest. (See id. at 868-73.)

Abad also testified that Aref "ha[d] no role" in the money-transmitting "service" (Tr. 743), and never made deposits for the service (see id. at 747). On cross-examination, when shown copies of deposit tickets and checks that he admitted were not in his handwriting, Abad stated that he was "not sure" whether Aref made deposits for the hawala into any feeder accounts. (Id. at 796-

800.)

Aref testified, through an interpreter, that he did not deposit money or write checks for his uncle's money-transmitting business.  (See id. at 848.)  When presented with numerous deposit tickets and checks that the expert witness had opined were in his handwriting, Aref denied that he had written the checks or made the deposits.  (See id. at 888-96.)

3.  Mentions of a Terrorism Investigation and Violence

Prior to trial, counsel for Abad had expressed concern that Special Agent Murphy would testify that he was assigned to the FBI's counterterrorism task force, and that the indictments of the defendants stemmed from a "terrorism investigation, assigned to a terrorism investigative unit." (Tr. 177.)  The government responded that it would not ask Murphy "what unit he's assigned to" and that it planned to "keep that off the table unless [the defendants] open the door." (Id.)  The government stated: "We're mindful of that, have taken precautions to make sure that's not injected here at all." (Id.)

In Abad's opening statement, his attorney told the jury that

> [e]very bit of this money was earned by hard-working people who paid their taxes on it and gave it to Mr. Elfgeeh in trust, not to keep, to transfer for them.  He had no tax obligation to pay for any of this money.  Every bit of this money came from a decent source, not criminal activity.

(Id. at 200-01.)  Outside the presence of the jury, the government argued that that statement constituted an "argument . . . that . . .

there's no proof the money came from terrorists or terrorism or anything like that; that rather it was immigrants'[ ]money being sent home to family and friends." (Id. at 230.) The government contended that that statement "open[ed] the door to getting [into evidence] the fact there was actually money transmitted, the government believes[,] to known terrorist organizations, checks that say for the Jihad from the defendant himself." (Id.) The district court, noting that opening statements do not constitute evidence at trial, ruled that this did not "open the door" because only a witness can open the door to related testimony. (See id.)

Later that day, during cross-examination of Murphy, counsel for Abad asked numerous questions about Murphy's visits to or surveillance of Abad's Carnival French Ice Cream shop, inquired whether Murphy had visited alone or with other agents, and elicited that the FBI had sent a confidential informant ("CI") into Abad's shop. Counsel then asked what Murphy's purpose had been in going there. Murphy responded:

> At some point, the first time I went there, I had a cooperating witness or a person that was working on behalf of the government. I wired that person up and the purpose to go there was to have that person gain information about Abad Elfgeeh on another matter. That was the first time.

(Tr. 336 (emphasis added).) Counsel for Abad then continued to probe into Murphy's purpose, and received two answers that mentioned the terrorism investigation:

> Q Actually you wanted this person to go in there, do a $100,000 transaction, didn't you?

> A I wanted that person to go in. At that time I was investigating a case that had to do with terrorism with a person in Yemen by the name of Mohamed--

- 14 -

MR. HANCOCK [counsel for Abad]: I move for mistrial.

THE COURT: No, we'll strike that. You asked him about what the investigation was. This case is not about terrorism, ladies and gentlemen.

Q Did you ask that person to go there and attempt to have $100,000, in excess[,] wired to him?

A No, I had that person go in there to try to attempt to move money from the United States to Yemen for terrorist causes.

Q Was he successful--

MR. FRIEDMAN [counsel for Aref]: Might I have a side bar, please?

(Side bar.)

MR. FRIEDMAN: I most respectfully ask for a mistrial, just for my client, who has been indelibly prejudiced now. I didn't ask any questions. Your Honor gave a ruling with respect to the witness'[s] answer. Then the witness on the very next question, without any prompting stuck it to Abad [sic] Elfgeeh for no reason other than to do it. It was not called for.

MS. CHEN [counsel for the government]: Quite the opposite. Mr. Hancock is going down a road, eliciting information that will clearly go into the other investigation. As the court is aware, the reason the CI was there [was] because he was investigating the Al Mo[a]yad case. That's why he went there. When Mr. Hancock keeps baiting the agent, the agent will give the response that he did which is entirely responsive, appropriate. Mr. Hancock could stop going down this road unless he wants to open it wide.

THE COURT: I'll deny this application for mistrial. You will proceed on this road at your own risk.

MR. HANCOCK: I happened to say he went into that place for two reasons; he needed a license, did he see any other licenses on the wall there to show he complied with other requirements like the health code requirement, sales tax, capitalization. He looked for this opportunity, not responsive to my question.

- 15 -

MS. CHEN: Entirely responsive.

THE COURT: My ruling is . . . no mistrial and be very careful how you approach this subject. You're asking him questions, he's reading it one way where you have another motive, but you've got to be very careful. He doesn't know what you're talking about. Be careful.

When this is over, you'll speak to your witness, stay away from that terrorism, please.

(Tr. 336-38.) The following morning, on a renewed motion for a mistrial by counsel for Abad, the court stated that it would "reiterate [to the jury] that this is not a terrorism trial. This is a banking violation" trial. (Id. at 384.) When the jury entered the courtroom, the court stated:

I'm going to advise you this is a case, as I said when I read to you the indictment, it's a case about banking and Hawalas not getting licenses. That's what the allegations are, has nothing to do with terrorism.

(Id. at 389.) This instruction was combined with a warning to the jurors not to read the newspapers (see Part I.A.4. below).

The subject of violence arose again on the third day of testimony, during the testimony of Abad. On direct examination, Abad stated that the fees he charged to customers covered certain charges the operation incurred:

The bank charges, and the services that they do in the other side where they deliver the money, they have messengers to go to a village, to someone who is in a hospital, to other parts of the city, to different cities. They will have messengers to take it to other parts of the country.

(Tr. 741.) On cross-examination, in an attempt to counter the testimony that money was sent to individuals in Yemen, some of whom were hospitalized, the government asked Abad, "[H]ave you ever sent money to support violence[?]" Abad answered "Absolutely not" before

his attorney objected, an objection that was sustained by the district court. (<u>Id</u>. at 792.) The government approached the subject again in reference to a list of customers who had given Abad money to send to Yemen:

Q And, in fact isn't it money they gave you to support a blood feud between your tribe and another tribe?

MR. HANCOCK: Objection, your Honor.

THE COURT: I will allow that.

A What was the question?

Q Isn't it money that these people on this list sent to Yemen to support a blood feud between your tribe and another tribe?

A We sent--they sent money not to blood, you're talking about, it's to--to have lawyers go to the government and fight a dispute.

Q I see. It was a legal dispute that you were sending money for?

A Sorry?

Q It was a legal dispute you say you were sending money for?

A The tribes have problems in the villages and we help the tribe, our side tribe.

Q This money was going to pay for lawyers, is that what you're saying?

A It's part for the government, for the lawyers and the expenses.

Q Isn't it in fact true the money went to buy weapons and ammunition for this fight?

MR. HANCOCK: Objection, your Honor.

THE COURT: I will allow it, if he knows.

A I don't know.

Q You don't know?

. . . .

Q   Do you recognize this as another note in Arabic? . . . .

Do you recognize that document?

A   Yes.

Q   In fact, Mr. Elfgeeh, doesn't it say that-- it's a letter to you actually, a note to you from your brother Yahaya, and it says basically, the weapons and ammunition are more than three million, and then it goes on to explain that Abdullah and his family are our guests now.  I recommend that you take 5,000 from each of his children and Mahmood's money is with you.  I see that you also take from him.  As for their father, he's not giving anything, neither now nor later.

Isn't it in fact true that the money that they are referring to is money to buy weapons and ammunition?

MR. HANCOCK:  Objection.

THE COURT:  I will allow it.

A   This is a letter and he said how much money they deposited to secure for the government side, the government take as a bail from each tribe in order to have this thing discussed.

Q   Mr. Elfgeeh, when your brother sent you this note and you read the weapons and the ammunition is more than three million, did you know what he was talking about?

A   No.

Q   You had no idea that there was this feud going on that involved weapons and ammunition between your tribe and another tribe?

A   I know what he said, but--

Q   You knew that the money you were sending over was going to be used for that purpose, didn't you, based on this note?

A   When what this note came, I knew it was-- when this note came.

Q   And you sent the money, isn't that right?

A  I don't know if I sent the money for this purposes.  I don't know that.

Q  Isn't it true that you actually got a number of correspondences from your brother on this particular issue about collecting money for this particular purpose, to fuel the feud between your tribe and another tribe?

A  There was some money, yes, sent for this.

(Tr. 793-96.)

On redirect examination of Abad, his attorney elicited further testimony about the tribal feud:

Q  You were asked a question, there was a tribal dispute in Yemen in which your family was involved or somebody was involved?

A  Yes.

Q  Explain that a little bit, please.

A  Tribes are fighting each other, have problems all the time.

Q  To your knowledge did the United States of America, the United States Government have a position in that dispute?

A  No, I don't think so.

(Tr. 829-30.)  Finally, on recross-examination, the government addressed the issue again:

Q  Mr. Elfgeeh, you were just asked about this feud between your family and another family in Yemen.  Do you recall testifying about that?

A  Yes.

Q  This is actually your family, right?  You referred to them as your tribe, right?

A  Not just my family, but the whole tribe.

Q  When you use the word "tribe," you're actually referring to people who come from the same region basically and have some blood connection?

A  You could say that.

- 19 -

. . . .

Q   In fact, did your brother fax you various correspondence about this feud that was ongoing?

A   Yes.

Q   In fact did he send you a fax that basically referred to various court cases that involved violence?

A   He did.

Q   Were not there two or three cases that involved grenades and other explosive devices that were part of this big dispute?

A   That's what happened in the village, yes.

Q   Isn't it in fact the money that you sent was supposed to help your family defend this dispute involving grenades and other ammunition?

A   To help fight the case.

Q   Wasn't it actually used though to buy weapons or other grenades?

MR. HANCOCK:  Objection.  There is no proof of that.

THE COURT:  I'll allow it.  He can answer yes or no.

A   I don't know.

(Tr. 833-34.)

4.   Publicity During Trial

The jurors had been sworn in on September 12, 2005; on September 13, counsel's opening statements were made, apparently with the press in attendance, and the presentation of testimony was begun.  On the morning of September 14, three New York City metropolitan area newspapers carried four articles relating to the trial.  The New York Daily News carried an article on page 3 that

stated in part:

> Nowhere in Assistant U.S. Attorney Pamela Chen's opening argument, though, was the word "terrorism" mentioned, even though the arrest of defendant Abad Elfgeeh, 50, was an offshoot of a <u>government crackdown on the financing of terrorist organizations abroad</u>.

> <u>Federal Judge Sterling Johnson has barred any mention of Elfgeeh's reputed ties to Yemeni cleric Mohammed Ali Hassan Al-Moayad, who was recently convicted of conspiring to provide material support to Hamas and Al Qaeda and referred to himself as Osama Bin Laden's "personal sheik</u>."

> A government witness, FBI agent Brian Murphy, was not allowed to testify he is assigned to a squad that investigates terrorism.

> Chen argued unsuccessfully yesterday that the jury should see checks seized from Elfgeeh with the words "for the jihad" and "mujahidin" written on them.

John Marzulli, "Jury Hears Charges Vs. Yemen Man," <u>New York Daily News</u>, September 14, 2005, at 3 (emphases added). The article also included information about the Carnival French Ice Cream shop, a definition of <u>hawala</u>, and a quote from Abad's counsel.

Another article, with an Associated Press byline, appeared on page 15 of <u>Newsday</u> and was entitled "Jury Won't Hear About Alleged Al-Qaida Links." It stated, in pertinent part:

> <u>Prosecutors have said [Abad Elfgeeh's] business was used by a Yemeni cleric convicted earlier this year of a scheme to fund al-Qaida and the Palestinian militant group Hamas</u>. But prosecutors cannot raise the topic of terrorism at Elfgeeh's trial unless the defense does first because they did not have enough evidence to charge Elfgeeh with a terrorism-related crime.

> Assistant U.S. Attorney Pamela Chen made her first attempt to bring up terrorism after an opening statement by defense attorney Frank Hancock, who called Elfgeeh a law-abiding citizen who sent money overseas for Yemeni immigrants innocently seeking to support their families and invest in their native

- 21 -

country.

> After the jury left the courtroom, Chen asked U.S. District Judge Sterling Johnson Jr. of Brooklyn to let her refute Hancock's claims by introducing what she called suspicious checks confiscated from Elfgeeh, some bearing the words "jihad" and "mujahidin." Others were made out to the Yemen-based Charitable Society for Social Welfare, which the FBI has described as a terrorist front.

> Johnson rejected her request but is expected to revisit the issue as the trial moves forward.

> Elfgeeh first came to the attention of FBI anti-terrorist agents as they investigated Sheik Mohammed Ali Hassan Al-Moayad, whom they eventually accused of funneling money from the United States to al-Qaida and Hamas. Al-Moayad was convicted of supporting and conspiring to support terrorism and sentenced to 75 years in prison in July.

> Witnesses at al-Moayad's trial said he kept Elfgeeh's number in his phone book and called Elfgeeh someone he trusted to transfer money from the United States to Yemen.

The Associated Press, "Jury Won't Hear About Alleged Al-Qaida Links," Newsday, September 14, 2005, at A15 (emphases added).

The New York Post contained two articles about the case. A news article entitled "Ice-Cream Terror Charges Melt Away" appeared on page 28. It reiterated allegations about Abad's links to Yemeni Sheik Mohammed Ali Hassan Al-Moayad and the district court's ruling that prohibited mention of terrorism. It also stated: "[Abad] Elfgeeh had pleaded guilty to the charges in 2003, but was allowed to withdraw [the guilty plea] after stating his lawyer at the time had not made him fully aware of the 11-year sentence that came with the deal." Zach Haberman, "Ice-Cream Terror Charges Melt Away," New York Post, September 14, 2005, at 28 (emphasis added). A column on page 9 by Andrea Peyser entitled "Trial Serves Up Some Real Nutty Buddies" stated in part:

- 22 -

When Elfgeeh was arrested, Attorney General John Ashcroft went so far as to say that this case proves "the FBI can better prevent terrorism and save American lives."

Was Abad Elfgeeh, upstanding American citizen, financing terror through ice cream? You may never know because federal jurors may never hear the "T" word spoken aloud.

Elfgeeh is standing trial on charges he illegally transferred money to Yemen--which could put him away for 15 years. But prosecutors agreed that mentioning terror might "prejudice" the jury, a source told me. This surreal trial gets even stranger, when you learn how it all came about.

On Elfgeeh[']s legal team in Brooklyn federal court is one Burton Pugach. He is a jolly paralegal and former lawyer who was disbarred more than 40 years ago after he was convicted of hiring three men to throw lye in the face of a girlfriend who tried to leave him. She was blinded permanently. Then he married her.

Then, eight years ago, he was accused of threatening to maim a second woman.

"I only asked someone to beat her up," Pugach, 78, said about his wife, who for some reason remains wed to him.

So now he wants to fight for fellow victims of the system.

Elfgeeh actually pleaded guilty to the charges against him two years ago. But then he met Pugach. He pleaded "not guilty" and now faces up to 15 years in prison if convicted. Pugach is convinced his client [sic] will walk. These two deserve each other.

Andrea Peyser, "Trial Serves Up Some Real Nutty Buddies," New York Post, September 14, 2005, at 9.

On the morning that these articles appeared, Assistant United States Attorney ("AUSA") Pamela Chen notified the district judge, before the jury was called into the courtroom, that publicity about the Elfgeehs' trial had appeared in the media. She pointed

out that the judge had not, either during his preliminary instructions to the jury or in the previous day's proceedings, instructed the jurors to avoid media reports about the trial. The AUSA asked,

> [c]ould the court admonish the jury as the standard not to read the paper and all that? I think perhaps yesterday that didn't happen. I want to make sure since I have seen--
>
> THE COURT: This case was in the paper?
>
> MS. CHEN: This morning.
>
> THE COURT: Which paper?
>
> MS. CHEN: The New York Post. There were reporters here yesterday. I think it also made the AP wire. I think it's worth reminding [sic] them.
>
> MR. HANCOCK: I didn't see it. I join in the application.
>
> MS. CHEN: Just cautionary.

(Tr. 388 (emphases added).) After calling the jury into the courtroom, the district court offered the following warning:

> The other thing I have to admonish you, this case is going to be decided by the evidence or lack of evidence. Evidence is sworn testimony of the witnesses and the exhibits that I allow in; therefore anything that anybody else says, whether defense counsel or the prosecutor or it's me is not evidence in the case.
>
> Also, if you read anything in the newspapers about this case--I don't think there will be anything in the newspapers [sic]--you're not to concern yourselves. Don't read that.

(Id. at 389.) This admonition was followed by a warning that the trial was not related to terrorism (see Part I.A.3. above).

That afternoon, after the lunch break, there was further discussion about the trial publicity outside the presence of the jury. Counsel for Aref stated:

- 24 -

Your Honor, you've been most scrupulous, have done a Herculean job in this case to instruct the jury to keep their focus on this case, that the issues are basically a banking issue, as you described it this morning.

Unfortunately, there have been some articles in the major daily newspapers of New York, and I'm talking about the Post, Newsday and the News which have contained very deleterious statements concerning the material that your Honor wanted to keep from the jury's knowledge.

In particular, the article speaks about the defendants' ties to "terrorists." The articles mention how your Honor prevented the government from including [checks], which bear words like Jihad and what the FBI describes as a "terrorist front."

The articles similarly refer to evidence linking these defendants to the defendant Al Mo[a]yad, who was tried before your Honor and convicted and Mr. Al Mo[a]yad is identified as being convicted and with links to Hamas and Al Qaeda.

The article further prejudices the defendant Abad Elfgeeh by disclosing the fact he had pled guilty before and withdrew his plea.

I would like your Honor to read the articles, the two I have in front of me and afterwards, I would like to move, most respectfully, for a mistrial, or in the alternative, have your Honor speak to the jurors individually and I don't mean 15 minutes each--quickly--to see, one, that they have not read the articles to ensure they won't read any more articles and, secondly, I make this application because I'm not sure whether your Honor specifically instructed the jurors before not to read articles about this case.

THE COURT: I did this morning.

MR. FRIEDMAN: May have done it on the train.

THE COURT: I'll speak to them again.

You wanted to say something, Ms. Chen?

MS. CHEN: No, I was going to say that's why we raised this issue this morning, your Honor, because we were aware of articles.

THE COURT: I was not aware of it, but I have

- 25 -

already seen it over the lunch break.

MS. CHEN: I thought you perfectly dealt with it by admonishing them. If the court would like to inquire of them when they return, if anybody has read any articles, we have no objection to that. Individual voir dires are not necessary, your Honor. Your standard way of dealing with it would be fine.

MR. HANCOCK: I don't know what the standard way is. I join in cocounsel's application. Sometimes when you have a situation like this, you make it worse.

THE COURT: I agree with you.

MR. HANCOCK: I don't know what the remedy is.

THE COURT: Generally in a situation like this, rather than call attention to it, because those who have not read it, maybe now they want to read it. I'll reiterate anything in the papers you're not to read. If you come across it, put it down. Again, I'll reiterate it, this case will be decided solely on the evidence.

MR. FRIEDMAN: Would your Honor as a group then ask the jury if they read any article dealing with this case? If you get a positive, we'll take care of it.

THE COURT: There might be some who have not read it, you'll call their attention to it. I did not know anything about articles when I came here this morning. Ms. Chen happened to mention it. I still didn't see it.

When I went back during the lunch hour, I was reading the newspaper and I came across it. In fact, my paper didn't have it. I got the Queens news that somebody else gave me, which is the Brooklyn news. That's the way I'm going to handle[] it.

MS. CHEN: May I note for the record when you spoke to the jury this morning about this issue, none of the jurors indicated verbally or in my observation in any other way that they actually had read anything when you mentioned the press issue.

THE COURT: It's going to be kind of delicate for me to mention this again. I think what I should do at the end of the day, when we get ready to go home, to mention it again as opposed to right after

lunch.

MR. FRIEDMAN: Again, I have made my request. My request is on the record.

THE COURT: I understand. I'm sensitive to it.

(Tr. 518-21 (emphasis added).) Accordingly, at the end of the day, the district court again instructed the jurors that they should avoid media reports about the trial:

> Have a nice weekend. Don't discuss the case. Keep an open mind. If you read anything in the paper about this case, put it down, do not read it.
>
> I will admonish you again that this case is going to be determined based solely upon the evidence, sworn testimony of witnesses and the exhibits that I have allowed in evidence.

(Id. at 600.)

Further discussion about the trial publicity occurred on the next day of trial, September 19, after a weekend break. This time, it was counsel for Abad who raised the issue:

> One other issue, Mr. Elfgeeh came to my office Saturday. For the first time I saw this article, an article in the Post, apparently went out in the morning edition. From what I've been able to discern, the editor came in, pulled it, but the first issue went out. This is, of course, the issue that jurors would get on their way to court in the morning. Part of it deals with Abad Elfgeeh, shows Mr. Elfgeeh next to Al Mo[a]yad, the two, making a link. Apparently Ms. Andrea Pizer (ph), a columnist for the Post talked to Mr. Puga[c]h, went into his history, indicated he was a nut and basically my client is a nut and--the article is as it is.
>
> I'm concerned the jury is going to see this. I have to put Mr. Elfgeeh on the stand after this. There are two allegations under direct testimony with the government [stating] my client is a terrorist, an allegation there's overwhelming evidence against Mr. Aref Elfgeeh because of the conspiracy, I suppose, would and could [come] back and touch on Abad Elfgeeh. I would like to put him on the stand to testify. I'm so afraid they're going to come up with information about terrorist

activity, Islamic charities, things of that nature.

For instance, there was a charity that Mr. Elfgeeh has given money to in the past, called "Islamic Relief," pledged $2 million to the Gulf region victims. He's given maybe $100, $200, [to] various agencies such as this, charitable agencies. He gets on the witness stand, starts talking about this charity versus that charity, whether this is a terrorist front or not, I can't put him on. On the other hand, I'm forced to put him on because of articles like this. I would ask for a motion in limine if he testifies, he does not go near any of these issues about charities; that the government not be allowed under some guise, character, some other reason to bring it up under cross-examination.

THE COURT: When you put a person on the stand, he can be cross examined as far as his story is concerned, issues of credibility. I'm not going to do that. I don't know what he's going to testify to, what his cross-examination is going to be.

I haven't seen that article. Let me see it now. I am again going to caution the jurors.

(Tr. 639-41.) When the jury entered the courtroom, the district judge stated:

I want to admonish you, again, keep an open mind; that you are not to read anything in the newspapers and that this case will be decided solely on the evidence, as I told you before, sworn testimony of the witness[es] and it's the answers, not the questions, and whatever exhibits I choose to admit.

(Id. at 645.)

The final discussion about the trial publicity occurred during a mid-morning break on the same day, September 19. It consisted principally of the following exchange:

THE COURT: Did you say you spoke to the editor of the New York Post?

MR. HANCOCK: No, sir.

I first received that Saturday morning, about noon, from Mr. Elfgeeh. It is my understanding that they pulled that article when the editor came in

- 28 -

that morning and replaced it with another article without Ms. Piser's [sic] column.

MS. CHEN: To clarify the record, when he says that article, I think he is referring only to the one about Mr. Pugach.

MR. HANCOCK: Yes.

THE COURT: It is an article from the New York Post dated September 14th. It refers to--the top article is Terror Case Melts and beneath it says Trial Serves Up Some Real Nutty Buddies.

This portion of the article, nutty buddies.

MR. HANCOCK: That bothers me.

THE COURT: That was pulled?

MR. HANCOCK: Yes, sir.

THE COURT: Okay. All right.

(Recess taken.)

. . . .

MR. HANCOCK: You asked before we broke about my taking umbrage to the article in the Post. I also take umbrage to the two photographs--

THE COURT: I'm assuming that you took exception to the whole article, but I wanted to clarify which one the editor withdrew. I understand that.

MR. HANCOCK: Thank you.

(Tr. 689-91.)

The record does not indicate that any articles other than the above-described September 14 articles were published about the defendants during the course of the trial.

5. The Jury's Verdicts and Forfeiture Findings

The jury found Aref and Abad guilty on all of the counts with which they were charged. After the jury returned its verdicts,

- 29 -

the trial proceedings turned to the issue of forfeiture to determine what, if any, assets the defendants would be required to turn over to the government. The government sought forfeiture of $22,435,467 on the ground that that was the total involved in defendants' operation of the hawala in violation of § 1960(a), citing 18 U.S.C. § 982(a)(1), which provides that

> [t]he court, in imposing sentence on a person convicted of an offense in violation of section . . . 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property.

The government also sought forfeiture of that sum on the ground that that was the amount involved in Abad's structuring offense in violation of 31 U.S.C. § 5324(a)(3), citing 31 U.S.C. § 5317(c)(1)(A), which provides that

> [t]he court in imposing sentence for any violation of section . . . 5324 of this title, or any conspiracy to commit such violation, shall order the defendant to forfeit all property, real or personal, involved in the offense and any property traceable thereto.

No evidence was presented at the forfeiture hearing; the jury simply heard argument from counsel as to what assets should be forfeited. The government argued that the amount to be forfeited should include all assets that passed through the Carnival French Ice Cream account. (See Tr. 1095-97, 1098-99.) Counsel for Abad briefly urged the jury to require the government to return to Abad the personal property that it had already seized from him. (See id. at 1097-98.) Counsel for Aref presented no argument. (See id. at 1098.)

After deliberating briefly, the jury returned a verdict

finding that $22,435,467 was involved in or traceable to the unlicensed money-transmission business or the structuring activity. (See Tr. 1115-17.) The verdict did not distinguish between the two defendants or between the various charges. Counsel for Abad promptly asked the district court to set aside the verdict, stating, "I think the jury was confused. How could the total amount of the money be subject to forfeiture when there was a mixture of checks and cash?" (Id. at 1119.) The district court denied the motion. (See id.) No other challenge was made.

B. Sentencing

Abad and Aref were sentenced in separate proceedings in February 2006. According to the presentence report ("PSR") prepared by the probation department on Abad, the advisory Guidelines range for imprisonment was 188-235 months, based on offense-level increases for an aggravating role in the offense, obstruction of justice, and the amount of money involved in the criminal activity. In sentencing Abad, the district court imposed a prison term of 188 months (see Abad Elfgeeh Sentencing Transcript, February 3, 2006 ("Abad S.Tr."), at 13), stating, "[a]ccording to Booker the[ sentencing guidelines] are advisory. And I have considered the guidelines, along with the other factors in 3553, and I have come to this particular sentence" (id. at 15).

The PSR on Abad also noted that the Guidelines-recommended range for the fine to be assessed against him was $20,000 to

- 31 -

$500,000, which encompassed all five counts on which he was convicted. The district court imposed a fine of $250,000 on each count (see id. at 13), for a total of $1.25 million. The court stated, "I impose this sentence because I think it is sufficient for the crime that was committed." (Id.) The court ordered Abad to forfeit $22,435,467.

The PSR prepared on Aref concluded that the Guidelines-recommended prison range was 51-63 months. That range was based on a base offense level of 6, plus a 16-step enhancement for the value of the currency--$1,615,893.25--that had been transferred during the time for which Aref was convicted of having participated in the offenses, and a two-step upward adjustment for obstruction of justice for having given perjurious testimony at trial and at the suppression hearing. Aref challenged the obstruction-of-justice adjustment, arguing that his trial testimony, given his difficulty with English, was the product of "'confusion, mistake or faulty memory.'" (Letter from Arthur S. Friedman to Shayna Bryant, United States Probation Officer, dated December 13, 2005 ("Aref Letter"), at 5 (quoting United States v. Dunnigan, 507 U.S. 87, 94 (1993)).)

At the sentencing hearing, the government suggested that Aref be credited with a two-step downward adjustment on the ground that he played a minor role in the offense, which would reduce his Guidelines-recommended incarceration range to 41-51 months. (See Aref Elfgeeh Sentencing Transcript, February 7, 2006 ("Aref S.Tr."), at 21.) The district court imposed a sentence of 51 months' imprisonment--the intersection between the government's suggested range and the PSR-recommended range (see id. at 25)--stating that

"there are more questions that loom than answers that were disclosed" (id. at 22). The district court stated, "I impose this [sentence] because I think it's sufficient for the crime that was committed," and "I took into consideration the guidelines and also 3553(a)." (Id. at 26; see also id. ("[T]his is something that I think is the right thing.").) The district court ordered Aref to pay a fine of $250,000 on each count, for a total of $500,000, and to forfeit $22,435,467.

## II. DISCUSSION

On appeal, both defendants contend principally that they were denied a fair trial by Special Agent Murphy's mentions of terrorism and by the news articles that linked Abad to persons who were known or believed to be terrorists, and that the district court gave the jury an erroneous instruction on the mens rea element of § 1960(a) as amended. Aref also contends that the district court erred in not excluding his postarrest statements and in not giving the jury a proper instruction as to its consideration of those statements. In addition, both defendants challenge their sentences on various grounds. For the reasons that follow, we find no basis for reversing their convictions or for disturbing most facets of their sentences. We vacate so much of Abad's sentence as imposed the $1,250,000 fine, and we remand for reconsideration of the obstruction-of-justice adjustment applied to Aref.

A.  Aref's Postarrest Statements

Aref contends that his postarrest statements about his involvement in the money-transmitting business were involuntary and that the district court erred in admitting them in evidence and in not instructing the jury that it could determine what weight to give them.  We see no error.

1.  Admissibility

Prior to trial, Aref moved to suppress his postarrest statements on the grounds that they were not voluntary, that when arrested he was in pain from a March 2003 operation on his back, that he had not been advised of his Miranda rights prior to making those statements, and that he did not waive those rights.  A pretrial suppression hearing was held at which Aref testified in support of these contentions (see Suppression Hearing Transcript dated September 12, 2005 ("Supp. Tr."), at 149-64), and Special Agent Murphy testified as follows.

Murphy testified that Aref was arrested in December 2003 at John F. Kennedy International Airport.  Murphy advised Aref of his Miranda rights at the airport, reading them from an advice-of-rights card he kept in his wallet.  (See Supp. Tr. 94.)  Aref indicated that he understood his rights.  (See id. at 95.)  Aref was then driven to the FBI's office in lower Manhattan for processing.  During that drive, Aref "began to say he knew what [the arrest] was about and that Abad Elfgeeh, his uncle, was the person to blame."  (Id. at 96.)  Murphy told Aref to wait until they arrived at the FBI office before speaking about the case.  (See id.)

Once they arrived at the FBI office, Murphy again advised Aref of his Miranda rights, and he gave Aref an advice-of-rights form written in both English and Arabic. (See id. at 96-97.) Murphy instructed Aref to read the form, asked Aref if he understood it, and then went over the form line-by-line to ensure that Aref understood each sentence. (See id. at 98.) Aref refused to sign the advice-of-rights form but indicated that he was willing to speak to the agents. (See id.) Questioning of Aref ensued, first in English, and then in Arabic with the aid of an interpreter, until Aref indicated that he was tired and wanted a lawyer, when the questioning ceased. (See id. at 101.)

The district court denied Aref's suppression motion. It found that "the testimony given by Agent Murphy [wa]s credible and that the testimony of the defendant, [Aref] Elfgeeh, [wa]s incredible." (Supp. Tr. 167.) The court found that Aref was given Miranda warnings at the airport; that on the drive from the airport to Manhattan, Murphy stopped Aref from initiating a conversation about the facts leading to his arrest; that "there was no violation of the defendant's Sixth Amendment right" to counsel (id. at 167-68); and that "the government ha[d] sustained its burden" to show a voluntary, knowing, and intelligent waiver of Aref's Miranda rights (id. at 168).

Aref contends that this ruling should be overturned on the ground that he was denied a fair opportunity to support his suppression motion because the district court violated his Sixth Amendment right of confrontation by limiting his attorney's cross-examination of Murphy. The record does not support this contention.

The district court has

> wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant.

Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986); see, e.g., Davis v. Alaska, 415 U.S. 308, 316 (1974); United States v. Salameh, 152 F.3d 88, 132 (2d Cir. 1998), cert. denied, 525 U.S. 1112 (1999).

Here, following Murphy's direct testimony, which lasted approximately 20 minutes, Aref's attorney cross-examined Murphy for nearly an hour and a half. The cross-examination covered various topics, including Aref's luggage (see Supp. Tr. 107, 112-13), the Vienna Convention on Consular Relations (see id. at 114-17), Arabic dialects (see id. at 124-25), notes taken by Murphy while interrogating Aref (see id. at 126-31, 136-40, 142-44), an FBI legal handbook (see id. at 131-32, 134-36, 139, 141-42), Aref's indication that he would like something to eat (see id. at 141-42), and Murphy's decision to ask a translator to help with the interrogation (see id. at 143-44).

Periodically during the cross-examination, the district court cautioned Aref's counsel that certain questions had been "[a]sked and answered." (Id. at 118; see also id. at 119, 120, 144, 145.) After some 45 minutes of questioning, the court reminded Aref's counsel, "[t]he issue before me . . . is the voluntariness of any statement made by the defendant," and stated, "I haven't heard you address that." (Id. at 132.) Aref's counsel indicated that his questioning was designed to show that Murphy was biased or that his testimony was otherwise inaccurate in describing his encounter with

Aref. (See id. at 133 (stating that "[a]s a matter of impeachment, if a witness is biased, his testimony may be rejected no matter what he says").) The court cautioned that it would permit Aref's counsel to "explore this a little more and then [the court would] cut it off" (id. at 133-34), because Aref's counsel was "wasting time" (id. at 134).

Aref's counsel continued to question Murphy in the same vein, and the court repeatedly cautioned that the cross-examination time was running out. The court eventually warned counsel that it would allow him 10 more minutes, and subsequently eight minutes, and then two minutes. (See id. at 137, 138, 139, 144.) Finally, the court told Aref's counsel that his "time [wa]s up." (Id. at 145.) When counsel objected that the court was "truncating [his] cross-examination of th[e] witness," the district court stated: "Let the record reflect this witness testified on direct examination approximately 20 minutes. You've been almost an hour and a half." (Id.) Aref has not suggested that this description was inaccurate.

This record does not indicate any abuse of discretion in the court's termination of Aref's counsel's cross-examination of Murphy. Rather, it reflects that the court exhibited considerable patience during a cross-examination that was repetitive and wide-ranging into matters that were at best tangential, without exploring the issue of voluntariness. We see no violation of Aref's confrontation rights.

Nor do we see any error in the court's ruling that Aref's postarrest statements were voluntary. Credibility-based findings that a defendant has waived his right to remain silent and his right

not to be interrogated in the absence of counsel, see generally Edwards v. Arizona, 451 U.S. 477, 482 (1981), are reviewed only for clear error, see, e.g., United States v. Isom, 588 F.2d 858, 862 (2d Cir. 1978). There was no such error here.

## 2. Jury Instructions as to Voluntariness

With respect to his postarrest statements, Aref also contends, citing United States v. Barry, 518 F.2d 342, 346-47 (2d Cir. 1975), that the court should have given the jury an instruction "pursuant to 18 U.S.C. § 3501." (Aref Elfgeeh brief on appeal at 41.) That section provides that the trial court, after admitting in evidence a defendant's self-inculpatory statements that it found were made voluntarily, "shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances." 18 U.S.C. § 3501(a); see also id. § 3501(e) ("As used in this section, the term 'confession' means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing."). We find no basis for reversal in the court's instructions.

While Aref's counsel noted during the charging conference that the district court's charge to the jury did not include instructions about the voluntariness of Aref's statements to Murphy (see Tr. 616), at no point was a jury instruction pursuant to § 3501 requested by Aref. His initial proposed instructions did not include such an instruction; and his subsequent letter to the district court, sent in response to an inquiry by the court as to

- 38 -

any remaining questions about the charge, did not request such an instruction. Accordingly, the court's failure to instruct the jury pursuant to § 3501(a) is reviewable only for plain error. See, e.g., United States v. Fuentes, 563 F.2d 527, 535 (2d Cir.), cert. denied, 434 U.S. 959 (1977). A plain error is one that, inter alia, prejudicially affected the defendant's "substantial rights" and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 732 (1993) (internal quotation marks omitted). Aref's § 3501 claim does not meet this test.

Although we stated in United States v. Barry that "[a] defendant may properly claim that he made no incriminating statements and that any statements which the jury might find that he made were coerced," 518 F.2d at 347, we have since clarified that "an instruction of the kind required by 18 U.S.C. § 3501 is mandated only where an issue of voluntariness has in fact been raised at trial," United States v. Fuentes, 563 F.2d at 535. An assertion that the defendant did not understand his Miranda rights is not sufficient to require the voluntariness instruction, see id. n.6; nor is it sufficient that there is testimony that the defendant had initially stated that he did not wish to talk to the officers, see id. at 535. Where "[t]here was little, if any, evidence from which a jury could infer that the statement was involuntary," § 3501(a) "does not require that the jury be specifically charged on voluntariness." United States v. Lewis, 565 F.2d 1248, 1253 (2d Cir. 1977), cert. denied, 435 U.S. 973 (1978).

Here, there is no suggestion that the court excluded any

relevant evidence as to voluntariness, but little such evidence was presented. Although Aref testified that when he was arrested he was in pain due to a back operation he had had nine months earlier, and Aref's counsel argued in summation that Aref did not understand the waiver form he read in Arabic and English (see Tr. 996), there was virtually no evidence from which the jury could infer that Aref's statements to Murphy were involuntary. And while the trial court did not instruct the jurors to determine for themselves what weight to accord to Aref's postarrest statements in particular, the court gave the usual general instruction that the jurors are "the sole judges" of "the weight and effect of all evidence." (Id. at 1024.) Given the record, we are not persuaded that there was error here, much less plain error, and we see no indication that Aref's substantial rights were affected.

B.  Testimony Mentioning Terrorism or Violence

Defendants contend that they are entitled to a new trial on account of Special Agent Murphy's mentions of terrorism during his testimony, and the government's questioning of Abad about a "blood feud" in Yemen. We disagree.

Where an inadmissible statement is followed by a curative instruction, the court must assume "that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant." Greer v. Miller, 483 U.S. 756, 766

n.8 (1987) (internal quotation marks omitted).

There can be little doubt that in the wake of the events of September 11, 2001, evidence linking a defendant to terrorism in a trial in which he is not charged with terrorism is likely to cause undue prejudice. The district court endorsed that view. When Murphy stated that he had been "investigating a case that had to do with terrorism"--in response to questioning by Abad's attorney that may have been confusingly repetitive but that did not actually require him to mention terrorism--the court promptly gave a curative instruction to the jury, stating that the case was not about terrorism. (Tr. 336.)

After Murphy, in answer to Abad's attorney's ensuing question probing Murphy's instructions as to what the CI was to do in Abad's shop, stated that he had asked the CI to attempt to "move money from the United States to Yemen for terrorist causes" (id.), the court promptly, in a sidebar conference, admonished the government to instruct Murphy to avoid gratuitous mention of terrorism and warned Abad's counsel to be more careful with his questions (see id. at 338). Although it might have been preferable for the court also to give a second cautionary instruction immediately rather than later, it was well within the court's discretion to conclude that another such warning so soon after the first was unnecessary, especially in light of the fact that Abad's attorney, who elicited the second mention of terrorism--to which Aref, not Abad, objected--had, before Aref's objection, already begun to ask his next question. The court gave another cautionary instruction the following morning (see id. at 389); and at various

- 41 -

points during the trial, as well as in its final instructions, the court gave additional general admonitions to consider only the testimony and documents that the court had allowed in evidence (see, e.g., id. at 445, 600, 645, 1021-22, 1024-27, 1029).

Although the two inappropriate answers by Murphy indicated that Abad was suspected of funding terrorism, the trial produced no further mentions of terrorism. We see no indication that the jury was unable or unwilling to heed the court's repeated instructions that terrorism was not an element in the case, that the case was about alleged banking-law violations, and that the jury must consider only the evidence admitted at trial. The properly presented evidence that defendants had operated an unlicensed money-transmitting business, and that Abad had structured the deposits into the Carnival and feeder accounts, was overwhelming. We cannot conclude that Murphy's two mentions of terrorism denied defendants a fair trial.

Defendants also argue that the government reintroduced the subject of terrorism into the trial by asking Abad whether he had sent money to Yemen in connection with tribal wars, blood feuds, or other violence, and that those questions should have been excluded. We disagree with their characterization of this questioning and with their challenge to its admissibility.

The trial court has broad discretion to exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; see, e.g., Old Chief v. United States, 519 U.S. 172, 174 n.1 (1997). "The term 'unfair prejudice,' as to a criminal defendant, speaks to

the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Id. at 180. "The rule of 'opening the door,' or 'curative admissibility,' gives the trial court discretion to permit a party to introduce otherwise inadmissible evidence on an issue (a) when the opposing party has introduced inadmissible evidence on the same issue, and (b) when it is needed to rebut a false impression that may have resulted from the opposing party's evidence." United States v. Rosa, 11 F.3d 315, 335 (2d Cir. 1993), cert. denied, 511 U.S. 1042 (1994). "When a defendant offers an innocent explanation he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination." United States v. Payton, 159 F.3d 49, 58 (2d Cir. 1998). "A defendant has no right to avoid cross-examination into the truth of his direct examination, even as to matters not related to the merits of the charges against him." Id.

Here, the district court ruled that if the Elfgeehs testified that they merely helped Yemeni immigrants to send money home to their family and friends, it would open the door to allow the government to attempt to show that the Elfgeehs sent money instead for bellicose purposes. (See Tr. 230.) Abad offered such testimony three times during his direct examination. (See id. at 728 ("Yemeni community member would come, give me the money and deposit the money in the bank, ask the bank to wire transfer the money to the other side, to his family, a member of his family."); id. at 739 ("[My brother in Yemen] give that money to the people--to

- 43 -

the beneficiaries that these people here send to the family to receive."); id. at 741 (describing sending money "to someone who is in a hospital").) Accordingly, the government was allowed to ask Abad whether he knew that the money he sent was being used to buy arms and ammunition and was allowed to submit documentary evidence obliquely referring to such use (see id. at 794), in order to attack Abad's credibility. In connection with this line of questioning, the government did not mention terrorism; Abad denied any knowledge that the money he sent was used for violent purposes (see id. at 795, 834); and defense counsel thereafter elicited testimony from Abad that, so far as he knew, the United States Government had no position in the dispute between Yemeni tribes (see id. at 829-30). We see no abuse of discretion in the district court's evidentiary rulings and no unfair prejudice to defendants.

C. Publicity and Juror Impartiality

Defendants also argue that the district court erred in failing to canvass the jury to determine whether any juror had been exposed to prejudicial media coverage during the course of the trial. They argue that the district court's repeated admonitions to the jury to avoid news coverage of the trial were insufficient to ensure that the jurors had not been exposed to such coverage and that defendants are entitled to a new trial based on this error. We conclude that the proceedings in this regard, though they seem to have been a bit haphazard, provide no basis for reversal.

"A district court's decision regarding juror impartiality is reviewed for abuse of discretion and deserves deference." United

- 44 -

States v. McDonough, 56 F.3d 381, 386 (2d Cir. 1995); see also United States v. Gaggi, 811 F.2d 47, 51 (2d Cir.) ("Gaggi") ("Absent a clear abuse of the trial court's discretion, its finding that the jury was impartial should be upheld."), cert. denied, 482 U.S. 929 (1987).

In Gaggi, we set out a three-step process for the trial court to follow when it is brought to the court's attention that there has been publicity about the case during trial.

> The simple three-step process is, first, to determine whether the coverage has a potential for unfair prejudice, second, to canvass the jury to find out if they have learned of the potentially prejudicial publicity and, third, to examine individually exposed jurors--outside the presence of the other jurors--to ascertain how much they know of the distracting publicity and what effect, if any, it has had on that juror's ability to decide the case fairly.

811 F.2d at 51; see also United States v. Lord, 565 F.2d 831, 838-39 (2d Cir. 1977). This process is simple and is efficient to determine whether the publicity has the potential to deprive the defendant of a fair trial. The court should of course give an instruction (even if one has been given earlier, for example, immediately after the jury has been sworn in) that the jurors should not read any news article about the trial or watch or listen to any item on television or radio about the trial. If this process is followed, we may presume, in the absence of any indication to the contrary, that the jurors have followed the court's instructions and have rendered their verdict solely on the basis of the evidence at trial. See, e.g., United States v. Zichettello, 208 F.3d 72, 106 (2d Cir. 2000), cert. denied, 531 U.S. 1143 (2001); United States v. McDonough, 56 F.3d at 386-87; United States v. Casamento, 887 F.2d

- 45 -

1141, 1154-55 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990); Gaggi, 811 F.2d at 51-53.

We have also held, however, that where the defendants prefer not to have the jurors interviewed individually, the trial court has discretion to forgo such interviews and instead give a general admonition to the jurors as a group to avoid exposure to publicity about the case. See United States v. Eisen, 974 F.2d 246, 267 (2d Cir. 1992) (individual interviews with the jurors were not necessary because "the defendants . . . specifically requested that no such individual voir dire be conducted for fear of magnifying the problem"), cert. denied, 507 U.S. 1029 (1993). In the absence of any indication that the jurors failed to follow the court's instructions, we found that "[t]he steps taken to protect the integrity of the jury deliberations were adequate under the circumstances." Id.

In the present case, so far as appears from the record, none of the parties called the court's attention to the prescribed three-step procedure or to any of the above authorities, although Aref's attorney eventually made a proper request. As described in Part I.A.4. above, on the morning of September 14, the second day of testimony, four news articles appeared in three New York City area newspapers. Before trial began that day, the AUSA brought that fact, that articles had been published, to the attention of the district court. (See Tr. 388.) The judge had not seen any of the news items (see id. at 520-21); Abad's counsel stated that he had not seen them (see id. at 388); and apparently neither the attorneys nor the judge had copies of any of the pertinent newspapers in

- 46 -

court. The AUSA asked the court to give the jury an admonition not to read the newspapers, and Abad's counsel "join[ed] in the application." (Id.) The court accordingly instructed the jurors that the case was to be decided strictly on the basis of the evidence at trial and that they were not to read anything in the newspapers about the case. (See id. at 389.)

We see no error in the way the district court handled the matter up to that point. Although the first step to be followed under Gaggi and its progeny is to determine whether the news coverage has the potential for unfair prejudice, that step could not be taken on the morning of September 14 because the judge had not seen, and was not presented with, any of the articles. At that time, the court could not sensibly do more than it did, which was, with Abad's attorney's concurrence, simply to instruct the jury to avoid news items about the case.

After the court had read one of the articles during the lunch break, however, the answer to Gaggi's first-step question was clear: The articles plainly had the potential for unfair prejudice. Each referred to the Elfgeehs' trial and made pointed references to, inter alia, terrorism and/or al Qaeda; in addition, they described evidence that the jury would not be allowed to see or hear at trial; and two of the articles stated that Abad had previously pleaded guilty to the charges on which he was now being tried. (See Part I.A.4. above.) Accordingly, had there been no objection or reservation expressed by defense counsel, the court should have proceeded to Gaggi's second step and canvassed the jury to determine whether any juror had been exposed to any of the news items.

However, Aref's attorney, who stated, "I'm not sure whether your Honor specifically instructed the jurors before not to read articles about this case" (Tr. 519), asked the judge to "speak to the jurors individually . . . to see . . . that they have not read the articles [and] to ensure they won't read any more articles" (id.). Abad's attorney joined in Aref's motion; but it would not have been appropriate for the court to grant that motion, thereby going directly to Gaggi's third step, because it had not yet determined, in accordance with step two, that there was a need for such individual interviews. Indeed, there may have been no such need, for the colloquys indicate that the articles on the trial did not appear in all editions of their respective newspapers.

The government, in opposition to Aref's initial motion for individual juror interviews, had suggested that the court instead make a general inquiry as to whether "anybody has read any articles." (Id. at 520.) Abad's attorney, although stating that he joined in Aref's motion (which sought a mistrial or individual juror interviews), also stated that "[s]ometimes when you have a situation like this, you make it worse"--a statement that was somewhat ambiguous as to whether he was expressing concern about conducting individual juror interviews or about posing a group question asking whether any juror had been exposed to the articles, or about both; but whatever his concern, it was shared by the court, which was hesitant to call the articles to the jurors' attention. The colloquy was:

> MR. HANCOCK: . . . . Sometimes when you have a situation like this, you make it worse.
>
> THE COURT: I agree with you.

MR. HANCOCK: I don't know what the remedy is.

THE COURT: Generally in a situation like this, rather than call attention to it, because those who have not read it, maybe now they want to read it[,] I'll reiterate anything in the papers you're not to read. If you come across it, put it down. Again, I'll reiterate it, this case will be decided solely on the evidence.

(Id.)

Nonetheless, Aref's attorney proceeded to ask the court to inquire of the jury "as a group" if anyone had "read any article dealing with this case," with further steps to be taken if there was an affirmative answer. (Id.) Although this was a proper request by Aref for the court to follow step two of the Gaggi procedure, Abad's counsel, whose above-quoted expression of concern followed essentially the same suggestion by the government, did not state that he joined in this new motion by Aref. The court denied this motion, reiterating that such a question might pique undue curiosity on the part of jurors who had not seen the articles, and decided simply to issue another warning at the end of the day. (See id. at 520-21.)

Had there been no expression of concern by Abad's attorney following the government's suggestion that the court pose a general question to the jury, or had Abad joined in Aref's eventually appropriate motion for such questioning, the court should have followed the Gaggi procedure and asked the jurors, as a group, whether any of them had been exposed to the articles. In the circumstances as they appeared, however, with one defendant requesting, properly, that the jury be asked whether any jurors had seen a news article and the other defendant, as was his right, not

- 49 -

joining in that motion and expressing concern that asking such a question might pose a greater danger of prejudice than not asking the question, we conclude that the trial judge had discretion to decide whether or not to put the question to the jury.

We cannot conclude here that the trial judge abused that discretion. The articles were clearly prejudicial, but it is hardly clear that the jurors would have seen them. The judge had not seen them; Abad's attorney had not seen them; and we assume that Aref's attorney had not seen them since he said nothing during the first discussion of the articles (and at lunchtime did not even recall that the court had instructed the jury that morning to avoid such articles). The articles did not appear in all of that morning's editions of their respective newspapers. Indeed, the judge himself could not find the article in the edition of the newspaper he first searched during the lunch break, finding it only in another edition of the paper. And Abad's attorney did not see one of the New York Post articles until the weekend. That article had appeared in the earliest edition but had been withdrawn from other editions. The court repeatedly cautioned the jurors not to view any news items on the trial, and we presume that the jurors followed the court's instructions.

In all the circumstances, with one defendant not joining the motion to have the court ask the jury whether anyone had seen any of the articles and expressing concern that asking that question might make matters worse, we conclude that the court did not abuse its discretion in declining to put the question to the jury.

D. Instructions on the Knowledge Requirement of Amended § 1960(a)

Defendants contend that in instructing the jury with respect to count four, which charged them with operating an unlicensed money-transmitting business after October 2001, the district court erred by not informing the jury that the government was required to prove that they knew the money-transmitting business was unlicensed. Although we agree that the jury should have been so instructed, we find no basis for reversal, for the court's failure to give that instruction explicitly was, in the circumstances of this case, harmless.

The post-October 2001 version of § 1960(a) provides, in pertinent part, as follows:

(a) Whoever knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b) As used in this section--

(1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and--

(A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

(C) otherwise involves the

transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity[.]

18 U.S.C. § 1960 (as amended October 26, 2001). Prior to October 26, 2001, the statute provided, in pertinent part:

(a) Whoever conducts, controls, manages, supervises, directs, or owns all or part of a business, knowing the business is an illegal money transmitting business, shall be fined in accordance with this title or imprisoned not more than 5 years, or both.

(b) As used in this section--

(1) the term "illegal money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and--

(A) is intentionally operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law; or

(B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section[.]

18 U.S.C. § 1960 (2000) (emphases added).

Thus, in order to convict a defendant of owning or conducting, etc., a business in violation of § 1960(a) prior to October 2001, the government was required to prove that the defendant had "know[ledge that] the business [wa]s an illegal money transmitting business," id. (emphases added), i.e., one that was "intentionally operated without an appropriate money transmitting license," id. § 1960(b)(1)(A) (emphasis added). Under § 1960(a) as amended, however, the government need prove only that the defendant

- 52 -

had "know[ledge]" that the business was "an <u>unlicensed</u> money transmitting business," 18 U.S.C. § 1960(a) (as amended) (emphasis added). Accordingly, the government is no longer required to prove that he knew the money-transmitting business was "illegal."

In amending § 1960(a) in this way in October 2001, Congress made § 1960(a) stricter by eliminating the requirement of proof that the defendant knew that a license was required. <u>See</u>, <u>e.g.</u>, <u>United States v. Hopkins</u>, 53 F.3d 533, 539 (2d Cir. 1995) ("One way of heightening criminal sanctions is to reduce the <u>mens rea</u> element of the prohibited acts . . . ."), <u>cert. denied</u>, 516 U.S. 1072 (1996). However, the language of the amended section-- "knowingly conducts . . . an unlicensed money transmitting business"--appears still to require proof that the defendant knew that the business was engaged in money-transmitting and also knew that the business had no money-transfer license. And that implication is supported by subsection (b)(1)(A) of the amended § 1960, which defines an "unlicensed money transmitting business," in relevant part, as one that "is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, <u>whether or not the defendant knew</u> that the operation <u>was required to be licensed or</u> that the operation <u>was so punishable</u>," 18 U.S.C. § 1960(b)(1)(A) (as amended) (emphases added). The amended subsection (b)(1)(A) thus explicitly makes it irrelevant whether or not a defendant knew that a license was required; but it does not state that it is irrelevant whether he knew it was unlicensed. <u>Cf.</u> <u>United States v. Talebnejad</u>, 460 F.3d 563, 568 (4th Cir. 2006)

- 53 -

(noting that "[t]he parties agree that the Government must allege and prove the defendant's knowledge" (1) that he "operate[d] a money transmitting business, (2) that [it] affect[ed] interstate commerce, and (3) that [it wa]s unlicensed under state law"), cert. denied, 127 S. Ct. 1313 (2007).  We infer from the language of subsection (a) itself and from the absence from subsection (b)(1)(A) of a "whether or not" clause mentioning knowledge of the possession of a license, that in order to convict under the amended § 1960(a), the government is required to prove that the defendant knew the money-transmitting business was unlicensed.

In the present case, Aref asked the court to instruct the jury, inter alia, that "[t]he government must also prove beyond a reasonable doubt that the defendant knew that the business was unlicensed."  The trial court should have included such an instruction in its charge to the jury.

Nonetheless, where "the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any . . . [constitutional] errors that may have occurred"-- including jury instructions that omit an essential element of the offense--"are subject to harmless-error analysis." Neder v. United States, 527 U.S. 1, 8-10 (1999) (internal quotation marks omitted). If we can "conclude[] beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error," i.e., that "the error 'did not contribute to the verdict obtained,'" then "the erroneous instruction is properly found to be harmless." Id. at 17 (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

In assessing the likely effect of imperfect instructions on the jury, we must view them in light of the jury charge as a whole. See, e.g., Cupp v. Naughten, 414 U.S. 141, 146-47 (1973); Gaggi, 811 F.2d at 61-62; United States v. Clark, 765 F.2d 297, 303 (2d Cir. 1985) (the charge "must be viewed in its entirety and not on the basis of excerpts taken out of context, which might separately be open to serious question"). In reviewing an ambiguous instruction, we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that is fundamentally unfair. See, e.g., Estelle v. McGuire, 502 U.S. 62, 72-73 (1991); Boyde v. California, 494 U.S. 370, 380 (1990).

In the present case, the court's instructions did not state that the government must prove that defendants knew they were operating the money-transmitting business after October 2001 without a license, and stated that as to the "fourth count," i.e., the charge that the Elfgeehs operated an unlicensed money-transmitting business after October 2001, "the government need only prove that the defendant knew that he was engaged in transmission of money on behalf of others." (Tr. 1049.) Nonetheless, the instructions in this regard were ambiguous, for both before and after that sentence, the court told the jury that the only difference between the pre- and post-October 2001 versions of § 1960(a) was that, under the latter, the government need not prove that the defendant knew that a license was required or that the operation was illegal.

Thus, as to count two, which, as the court read it to the jury, charged Abad with conducting a money-transmitting business between January 1995 and October 2001 "knowing that the business was

- 55 -

an illegal money transmitting business," the court stated that the government was required to prove that Abad "<u>knew that the business was an illegal</u> money transmitting business, which means that it was intentionally operated without an appropriate money transmitting license <u>and that the defendant was aware that the business was required to be licensed</u>."  (Tr. 1043, 1045 (emphases added).)

After explaining the terms "knowingly," "willfully," and "intentionally," and the ways in which those mental states may be evidenced, the court turned to count four, which charged both Abad and Aref with conducting a money transmitting business between November 2001 and January 2003.  The court stated that the amended § 1960(a)

provide[s] in relevant part:

> <u>Whoever knowingly conducts, controls, manages, supervises, directs or owns all or part of an unlicensed money transmitting business shall be guilty of a crime.</u>

> The elements required to prove the defendant guilty of Count Four are the same as those required for Count Two, <u>with one exception</u>.  That exception is that for Count Four, the government <u>does not have to prove that the defendant knew of the licensing requirement or that it was unlawful</u> to operate such a business without a license.  That is because the statute changed in November 2001, such that it was <u>no longer necessary that the defendant [k]new of the licensing requirement</u> in order to be guilty of the crime.

(Tr. 1049 (emphases added).)  Up to that point, the instruction was correct.  The ensuing sentence, that "the government need only prove that the defendant knew that he was engaged in transmission of money on behalf of others" (<u>id</u>.), was unduly limited and thus introduced an ambiguity.  The court then continued:

> In other words, in Count Two, which charges the

- 56 -

> defendant Abad Elfgeeh with conducting an unlicensed money transmitting business between January 1995 and October 2001, the government must prove that the defendant knew of the licensing requirement or that the business was illegal. However, for Count Four, which charges both defendants with conducting an unlicensed money transmitting business between November 2001 and January 2003, the government need not prove that the defendants knew of the licensing requirement or that it was unlawful to operate such a business without a license.

(Tr. 1049-50.)

Thus, viewing the instructions as a whole, there was a single sentence that was erroneous, and it was preceded and followed by correct instructions that the only difference between counts two and four was that on count four the government did not need to prove that the defendant knew that a license was a legal requirement. We think it highly unlikely that the jury focused on that lone erroneous sentence and disregarded the correct instructions that surrounded it.

In any event, the evidence at trial was such that the jury verdict would have been the same absent the error. As to Abad, a March 2002 letter from the New York State Banking Department, found in his files, stated that a license was required for a money-transmitting business; Abad's attorney had told Abad that he needed a license; and a State Banking Department witness testified that Abad had no license. There could be no doubt that Abad knew his money-transmitting business was unlicensed.

As to Aref, although the evidence was more circumstantial, we likewise conclude beyond a reasonable doubt that the instructional error did not contribute to the verdict against him. First, we note that the matter of Aref's knowledge as to whether the

- 57 -

money-transmitting business was unlicensed was not expressly put in issue. His attorney's opening statement to the jury did not suggest that Aref was unaware that the business was unlicensed; his summation did not suggest that the government had failed to prove that Aref knew the business was unlicensed. And Aref's testimony was that he did not participate, not that he was unaware that the business was unlicensed.

The government's evidence, on the other hand, overwhelmingly revealed the furtiveness of the actions of Aref, as well as Abad, in the money-transmitting operations. It showed, inter alia, that the hawala used numerous different bank accounts and small denominations of money; that Aref, like Abad, opened accounts using the names and/or addresses of other persons or entities; that even within the Carnival store (which was listed as Aref's employer on bank documentation relating to one or more of Aref's accounts), the money-transmitting business was not promoted openly; that customers were limited to known members of the Brooklyn Yemeni community; that neither Abad nor Aref ever reported any income from the business in their respective tax filings; and that Aref continued to use the Prospect Deli account for hawala business after that deli closed in 1998. And when Aref (at Abad's behest) sent the last $20,000 in the Prospect Deli account to Abad's brother, he did not write a $20,000 check on that account to Abad's brother. Rather, Aref signed two Prospect Deli checks to himself and deposited them in his own account; and from his own account he wrote several checks intended for Abad's brother but made them payable to Aref's own son and to others he could not remember at

trial.  (See, e.g., Tr. 868-76.)

The surreptitious manner in which Aref helped to operate the hawala was overwhelming evidence that he knew that its operation was not authorized.  As possession of a license would indicate authorization, the jury was entitled to find that Aref knew the hawala was not licensed.

In sum, viewing the instructions as a whole and the nature of the evidence presented at trial, we are persuaded beyond a reasonable doubt that the error in the instructions was harmless because the jury would have reached the same verdicts had it been instructed not to convict these defendants unless it found they knew the business was unlicensed.

E.   Sentencing

Each defendant makes several challenges to his sentence. Abad contends that the amount of his fine is unreasonable, and he requests a remand to a different district judge for resentencing. Aref contends that the calculation of his sentence should not have included consideration of acts committed by Abad and should not have included an adjustment for obstruction of justice.  In addition, defendants challenge the accuracy of the forfeiture verdict and contend that the forfeiture amount violates the Excessive Fines Clause of the Constitution, U.S. Const. amend. VIII; and they contend that the prison terms imposed on them are unreasonable and create unwarranted disparities between them and others convicted of similar crimes.  Considering the sentencing factors listed in 18 U.S.C. § 3553(a), and reviewing defendants' sentences for

reasonableness, see United States v. Booker, 543 U.S. 220, 261 (2005)--both substantive reasonableness and procedural reasonableness, see, e.g., United States v. Canova, 485 F.3d 674, 679 (2d Cir. 2007); United States v. Fernandez, 443 F.3d 19, 26-27 (2d Cir.), cert. denied, 127 S. Ct. 192 (2006); United States v. Crosby, 397 F.3d 103, 114 (2d Cir. 2005)--we conclude that except for Abad's challenge to his fine and Aref's challenge to the obstruction adjustment, these challenges lack merit.

### 1. The Amount of the Fine Imposed on Abad

In calculating a defendant's fine, the sentencing court must follow a procedure similar to the post-Booker procedure that it is to follow in calculating a defendant's term of imprisonment: It must consider the Guidelines recommendation for the imposition of a fine, consider the § 3553(a) factors, and consider the fine-specific factors listed in 18 U.S.C. §§ 3571 and 3572. See United States v. Rattoballi, 452 F.3d 127, 139 (2d Cir. 2006) ("Rattoballi"). Section 3572 requires the court to consider, inter alia, "the defendant's income, earning capacity, and financial resources." 18 U.S.C. § 3572(a)(1). The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." Guidelines § 5E1.2(a). The defendant must be given at least a minimal opportunity to show that he lacks the ability to pay the fine proposed by the court. See, e.g., United States v. Marquez, 941 F.2d 60, 65-66 (2d Cir. 1991).

"A non-Guidelines sentence that a district court imposes

- 60 -

in reliance on factors incompatible with the Commission's policy statements may be deemed substantively unreasonable in the absence of persuasive explanation as to why the sentence actually comports with the § 3553(a) factors." Rattoballi, 452 F.3d at 134.

> [I]f a district court elects to impose a non-Guidelines sentence outside the applicable Guidelines range, it has a statutory obligation to include a statement in the written judgment setting forth "the specific reason for the imposition of a sentence different from" the recommended Guidelines sentence.

Id. at 128-29 (quoting 18 U.S.C. § 3553(c)(2)).

The PSR on Abad calculated that, under Guidelines §§ 5E1.2(c)(3) and (4), the recommended range of the total fine for the five offenses of which he was convicted was $20,000 to $500,000. The district court instead imposed a fine of $1.25 million, more than twice the sum prescribed by the advisory Guidelines. This was somewhat less than the statutory maximum, given Abad's conviction under § 5324 for structuring. See 18 U.S.C. § 3571(b)(3) (setting $250,000 as the maximum fine for each count of conviction for violating 18 U.S.C. § 1960(a) or 31 U.S.C. § 5324); but see 31 U.S.C. § 5324(d)(2) ("Whoever violates this section while violating another law of the United States or as part of a pattern of any illegal activity involving more than $100,000 in a 12-month period shall be fined twice the amount provided in subsection (b)(3) . . . of section 3571 of title 18 . . . ."). The court did not state whether its fine of $1.25 million was a Guidelines-departure fine or a non-Guidelines fine, stating only, "I am also going to fine the defendant $250,000 on each count for a total of--what is it--$1.5 million [sic]. I impose this sentence because I think it

is sufficient for the crime that was committed." (Abad S.Tr. 13.) The PSR had concluded that, given the amount Abad would be required to forfeit, he would not be able to pay a fine in any amount.

Although Abad's present challenge to his fine triggers only plain-error analysis because he did not contest the amount of the fine in the district court, we conclude that there was plain error in the proceedings in connection with the imposition of the fine, for the record does not indicate that Abad was given either notice that a fine of such magnitude was contemplated or an opportunity to be heard on his ability to pay such a fine. We do not see in the government's presentencing submission to the district court any request for imposition of an above-the-Guidelines-range fine. Nor has the government called to our attention any indication in the record that Abad was given notice by the court that it was considering imposing a fine above the top of the Guidelines-recommended range. We conclude that the imposition of a fine of more than double the maximum recommended by the Guidelines, without advance notice to the defendant, without affording him an opportunity to present evidence as to his ability to pay a fine, without any findings as to his ability to pay a fine, and without any acknowledgement by the district court at sentencing of its deviation from the Guidelines, constituted a plain error that substantially impacted the fairness, or at least the appearance of fairness, of the sentencing proceeding. See, e.g., United States v. Mordini, 366 F.3d 93, 95 (2d Cir. 2004); United States v. Gordon, 291 F.3d 181, 191 (2d Cir. 2002), cert. denied, 537 U.S. 1114 (2003). Accordingly, we vacate so much of Abad's sentence as

- 62 -

imposed a fine of $1.25 million, and we remand for reconsideration of the amount of the fine.

We deny Abad's request, however, that we remand to a different district judge. "As a general rule, even when a sentencing judge has been shown to have held erroneous views or made incorrect findings . . . resentencing before a different judge is required only in the rare instance in which the judge's fairness or the appearance of the judge's fairness is seriously in doubt." United States v. Bradley, 812 F.2d 774, 782 n.9 (2d Cir.), cert. denied, 484 U.S. 832 (1987). This is not such an instance.

On remand, the district court must give Abad an opportunity to present evidence with respect to his ability to pay a fine and make specific findings as to Abad's ability to pay the fine imposed. If the court decides to impose a fine that is different from the Guidelines-recommended range, it must also provide an explanation as to the specific reason for its decision.

2. Aref's Challenges to the Obstruction-of-Justice and Loss-Amount Components of his Guidelines Offense Level

"[I]f a defendant objects to a[n obstruction of justice] sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to, or obstruction of, justice, or an attempt to do the same . . . ." United States v. Dunnigan, 507 U.S. 87, 95 (1993). A district court may satisfy this requirement by adopting the recommendation of an obstruction enhancement found in the PSR, provided "the findings of the PSR [a]re sufficiently detailed and explicit." United States v. Johns,

324 F.3d 94, 98 (2d Cir.), cert. denied, 540 U.S. 889 (2003).

The PSR recommended that Aref's offense level be increased by two steps pursuant to Guidelines § 3C1.1 for obstruction of justice on the basis that his testimony at trial and at the suppression hearing was perjurious. Aref objected, arguing that any falsity in his testimony was attributable to his difficulty with English, or to "'confusion, mistake or faulty memory.'" (Aref Letter at 5 (quoting Dunnigan, 507 U.S. at 94).) The district court did not address Aref's objection to this adjustment. It neither made specific findings as required by Dunnigan nor expressly adopted the findings made in Aref's PSR. Accordingly, we remand for resentencing of Aref in order for the district court to consider the obstruction-of-justice adjustment and to make whatever specific findings are warranted.

We see no merit, however, in Aref's contention that his offense level, enhanced by 16 steps because the amounts transferred during the period of his participation in the conspiracy totaled $1,615,893.25, see Guidelines § 2B1.1(b)(1)(I), should have been calculated without reference to any acts committed by Abad. Given the evidence discussed in Part I.A.1. above as to Aref's participation in the hawala, this enhancement was proper because, inter alia, Aref was convicted of conspiring to operate the unlicensed money-transmitting business and the entire amount transferred during that period was reasonably foreseeable to him, see Guidelines § 1B1.3(a)(1)(B).

3. Forfeiture

Defendants challenge the $22,435,467 forfeiture orders, contending (a) that the jury, in determining the forfeiture amount, should have excluded checks of third persons not made out to cash, and (b) that the forfeiture amount is unconstitutionally excessive. We note that the constitutional challenge was not made in the district court and hence triggers plain-error analysis. We also note that although Aref in his brief on appeal has adopted Abad's arguments to the extent that they may apply to Aref, Aref has not made any challenges of his own to the forfeiture amount. We conclude that the challenges made by defendants lack merit and do not require extended discussion.

The contention that checks of third parties should have been excluded is meritless for two reasons. First, the statutes require forfeiture of all "property . . . involved in" the offenses of which defendants were convicted, 31 U.S.C. § 5317(c)(1); 18 U.S.C. § 982(a)(1). There is no question here that the moneys deposited by means of structured transactions in violation of 31 U.S.C. § 5324(a)(3) and transferred in the unlicensed operation in violation of § 1960(a) included the checks of third parties. Hence those checks plainly were "involved in" those offenses and were not excludable. Second, even if such checks had been excludable, defendants presented no evidence of the dollar amount represented by those checks and hence gave the jury no basis for returning a verdict in an amount less than that sought by the government.

The constitutional challenge advanced by defendants fares

no better. "[F]orfeiture is unconstitutionally excessive if it is 'grossly disproportional to the gravity of a defendant's offense.'" United States v. Collado, 348 F.3d 323, 328 (2d Cir. 2003) (quoting United States v. Bajakajian, 524 U.S. 321, 334 (1998)), cert. denied, 541 U.S. 904 (2004). In determining whether a forfeiture is grossly disproportional, we are to evaluate

> (a) the essence of the crime of the [defendants] and its relation to other criminal activity, (b) whether the [defendants] fit into the class of persons for whom the statute was principally designed, (c) the maximum sentence and fine that could have been imposed, and (d) the nature of the harm caused by the [defendants'] conduct.

United States v. Collado, 348 F.3d at 328 (citing Bajakajian) (internal quotation marks omitted).

Although the record is silent as to the fourth factor, the other three reveal that the order for a forfeiture of $22,435,467 is not disproportional. The essence of defendants' offenses was the unlicensed transmission of money, and neither defendant received the statutory maximum prison term allowed. The trial evidence showed that the total amount deposited into the Carnival account was $22,190,642.21, and the total amount withdrawn was $21,995,556.54; these sums, which were integral to the offenses, are quite close to the amount ordered forfeited. And although Abad testified that his "service" was limited to members of the Yemeni-American community and that the money was being sent home to "family" (Tr. 726, 728), the evidence showed that defendants in fact transmitted the moneys to 25 different countries. Plainly, defendants were persons at whom § 1960(a) was aimed.

## 4. The Alleged Unreasonableness or Disparity in Prison Terms

Finally, we see no merit in the Elfgeehs' contention that the prison terms imposed on them--51 months for Aref, 188 months for Abad--are substantively unreasonable or unwarrantedly high in comparison to the terms of imprisonment meted out to others convicted of similar crimes. While "we may remand cases where a defendant credibly argues that the disparity in sentences has no stated or apparent explanation," United States v. Ebbers, 458 F.3d 110, 129 (2d Cir. 2006), cert. denied, 127 S. Ct. 1483 (2007), we see no disparity here. The Guidelines ranges are designed to eradicate unwarranted disparities between defendants convicted of similar conduct and with similar criminal backgrounds. Except to the extent that a modification of Aref's offense level may be required with respect to the obstruction-of-justice adjustment discussed in Part II.E.2. above, both sentences were within the applicable Guidelines ranges. And except to that extent, we see no basis for concluding that the prison terms imposed are unreasonable, given that the district court's articulation of the reasons for the prison terms imposed, although not extensive (see Part I.B. above), was sufficient to show that the court considered the Guidelines and the required § 3553 factors, see generally United States v. Fernandez, 443 F.3d at 30.

CONCLUSION

We have considered all of defendants' contentions on these appeals, and except as indicated above, have found them to be without merit. Defendants' convictions, and all aspects of their sentences except the following, are affirmed. We vacate the sentence of Abad Elfgeeh and remand for reconsideration of the amount of his fine; we remand with respect to Aref Elfgeeh for reconsideration of his term of imprisonment in light of the findings to be made as to the adjustment of his Guidelines offense level for obstruction of justice.